NUMBER 13-00-098-CR

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

___________________________________________________________________


HOWARD L. FOSTER , Appellant,


v.

THE STATE OF TEXAS , Appellee.

___________________________________________________________________


On appeal from the 36th District Court

of Aransas County, Texas.

__________________________________________________________________


O P I N I O N


Before Justices Dorsey, Yañez, and Baird (1)

Opinion by Justice Baird


Appellant was charged by indictment with the offense of murder. A jury convicted appellant of the charged offense and
assessed punishment at twenty years confinement in the Texas Department of Criminal Justice--Institutional Division and a
fine of $10,000.00. Appellant raises three points of error. (2)

We affirm.

I. Sufficiency Challenges.

Points of error one and two contend the evidence is legally and factually insufficient to sustain the jury's verdict. 

A. Standards of Appellate Review.

To determine whether the evidence is legally sufficient we employ the standard of Jackson v. Virginia and ask "whether,
after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt." 443 U.S. 307, 319 (1979). Under a factual sufficiency review,
instead of viewing the evidence in the light most favorable to the verdict, the evidence is viewed in a neutral light, favoring
neither party. Clewis v. State, 922 S.W.2d 126, 134 (Tex. Crim. App. 1996). In this neutral light, we consider and weigh all
the evidence and set aside the verdict if the evidence is insufficient or if the verdict is so against the great weight and
preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of
probative force in support of the verdict. See Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex.1986). Under this
standard, if the appellant is attacking an adverse finding on an issue to which he did not have the burden of proof, he must
demonstrate that there is insufficient evidence to support the adverse finding. Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim.
App. 2000).

B. Factual Summary.

This trial dealt with a large number of witnesses. To provide an accurate recount of the record evidence, the testimony will
be set forth in chronological order, primarily summarized but restated verbatim where appropriate.

Appellant and the complainant had known each other for a number of years and began living together. Katherine Miller
was a barmaid at Kitty's, a bar in Rockport, who knew the complainant and appellant as frequent customers. In 1997,
appellant and Charley Johnson came to the bar without the complainant. Katherine asked of the complainant's whereabouts
and appellant stated: "She had another one of her accidents." Katherine resumed her duties and heard appellant say that he
had slapped the complainant "so hard that she fell and hit the dishwasher door, and that it left ... a golf ball sized egg on her
head." 

Connie Miller, the manager of Kitty's, testified that on one occasion the complainant entered the bar wearing sunglasses. 
When she removed them, Connie noticed the complainant had a black eye. When Connie asked the cause of the injury,
appellant interrupted and stated the complainant had fallen "off the bed and hit the end of the ... night stand." Connie stated
the complainant was constantly exhibiting bruises. When offering an explanation for her bruises, the complainant would
state she either fell or that she was drinking and fell. Connie described some of the bruising on the complainant's arms as
fingerprint or finger-shaped bruises. 

Marie Dimsdale, a neighbor, visited the complainant in early April, 1999. The complainant rose to go to the restroom and
fell. When Dimsdale approached to help the complainant, appellant stated: "Don't help her. Let her crawl on her hands and
knees like the animal she is. She's nothing but a drunk. Don't help her." Approximately two weeks later, Dimsdale was
again in the complainant's home. Dimsdale testified the complainant had two black eyes, her face was bruised and her wrist
was swollen. Appellant asked Dimsdale: "How do you like [the complainant's] black eyes? The drunk fell again." 
Dimsdale countered that the complainant's injuries were not the result of a fall but rather from being beaten by appellant. 
Appellant responded by ordering Dmisdale to leave the residence. 

On April 19, 1999, the complainant's daughter, Diane Sumners, received a telephone call from appellant. Appellant stated
the complainant was unkept and drinking heavily, and asked the daughter to pick up the complainant. If the daughter did
not, appellant stated he would leave the complainant alone "to die." Sumners contacted Adult Protective Services. On
April 20, 1999, Jon Turnbull, an employee with the Adult Protective Services, was assigned to follow up on the inquiry
made by Sumners. Turnbull went to the complainant's home and interviewed the complainant. 

On the evening of April 26, 1999, the date alleged in the indictment, Rhonda Evanchak, an Aransas County emergency
medical technician was dispatched to the complainant's home. Appellant stated the complainant had fallen and described a
seizure. Evanchak found the complainant lying face down on the floor "in the grip of a seizure." The complainant was in
"an altered state of mind" described as "conscious but confused." Evanchak stated the complainant was very bruised. 
Some of the injuries appeared to be old. Specifically, she described bruising to the face and arms in various stages of
healing. The complainant had raccoon's eyes which normally suggests fractures of the skull. She also had nasal swelling. 

Penny Bowman worked at North Bay Hospital in Aransas Pass as an emergency room registered nurse when the
complainant arrived. The complainant had old and new bruises on her body, raccoon eyes, bruising of the facial area and
nose, and on her back. Bowman formed the belief that the bruising was not consistent with a fall. Upon further questioning
by Bowman, the complainant stated she had been "hit by her boyfriend." A CT scan was performed which showed a
subdural hematoma. 

Robert Galbreath was also a registered nurse at North Bay Hospital who assisted in the treatment of the complainant. She
had "massive bruising to the face," described as "her whole face was one solid bruise," bruising to the back of her ears and
head; her nose appeared broken. Galbreath could see "knuckle marks" to the complainant's temples, and fingerprint
markings from grasping or grabbing. To Galbreath, the complainant's injuries indicated some type of facial trauma from
being hit "multiple times" over a sustained period. When questioned about the cause of her injuries, the complainant
initially stated that she fell. However, upon further questioning, the complainant stated: "You know, he beats me. He -- he
hits me a lot." Due to the extent of her injuries, the complainant was transferred to Doctors' Regional Medical Hospital in
Corpus Christi. 

Although the record is not clear as to the precise date, Turnbull later visited the complainant at the hospital where she twice
denied that her injuries were in any way caused by appellant. 

Patricia Parker was a nurse at Doctor's Regional Medical Center who came into contact with the complainant on April 27,
1999. She described the bruising around the complainant's eyes and to her arms, legs and back. The complainant stated the
injuries were sustained as a result of a fall. 

Appellant called Sumners and stated the complainant had been transferred to Corpus Christi Hospital for brain surgery. 
Appellant stated he would take the complainant her hairbrush and glasses but that he had to return to Rockport to "be with
his dogs." 

Dr. Victor Kareh, a neurosurgeon operated on the complainant on April 28, 1999, to remove the subdural hematoma. 
Kareh stated the condition would be life-threatening if left untreated. Such hematomas are caused by trauma to the head. 
The complainant's hematoma was believed to be two to three days old. Kareh opined that the hematoma was sustained
from a single episode, which would have included multiple blows specific to that area of the head. The hematoma was
consistent with being hitting, kicking, or striking someone in the head. Each such event would be an act clearly dangerous
to human life. Kareh also testified that an accidental fall could cause a subdural hematoma. Kareh stated the complainant
progressed well after the surgery and that she was expected to survive. 

Denise Townsley was a post-surgery nurse at Doctors' Regional Medical Hospital and treated the complainant. In that
capacity, Townsley did an assessment and described bruising consistent with that described above. The complainant stated
the injuries were sustained when she fell and hit her head while in an intoxicated state. The complainant had a scar on her
head where the surgery had been performed. And also on the complainant's head was a similar scar which had healed. 

On April 30, appellant again called Sumners and asked why he was being denied visitation rights to the complainant. 
Sumners stated the denial was due to the injuries sustained by the complainant. Appellant asked Sumners if she thought
appellant would choke or stab the complainant if he gained access. 

The complainant died on May 4, 1999. Dr. Lloyd White, the Nueces County Medical Examiner, performed the autopsy. 
White's external examination of the body revealed the bruising described above. White described the complainant's injuries
as defensive injuries which he defined as "injuries of the hands and forearms that occur when an individual raises them up
in order to fend off some kind of attack." White stated the injuries were not consistent with falling. White opined that the
complainant's injuries were more likely the result of an assault rather than an accidental fall. White explained that the
multiple points of impact on the complainant's head "on the right side, across the front, the top, and on the left side"
suggested something other than just an individual falling down one time. Additionally, it would be unlikely that someone
who had simply fallen would have knuckle imprints on her face. Although White had received reports that the
complainant was a chronic alcoholic, White's examination of the liver did not support that conclusion. (3) In addition to
performing the autopsy, White examined the hematoma previously removed from the complainant. White stated the
trauma that caused the hematoma was a serious bodily injury. White concluded the complainant died as a result of blunt
force injuries to the head and brain. 

Dr. Ronald DeVere, a neurologist reviewed the complainant's medical records and White's autopsy report. DeVere
testified that the injuries sustained by the complainant could have been caused accidentally rather than intentionally. This
was especially true if the complainant was a chronic alcoholic because that condition causes the brain to shrink and those
individuals, as a result of their unsteady gait, have a tendency to fall more frequently. But DeVere could not rule out an
assault as the cause of the complainant's injuries. DeVere also reviewed medical records from 1992-93 which related to a
previous treatment of the complainant for another subdural hematoma. Those records indicated the complainant suffered
that injury as a result of a fall caused by a seizure brought on by alcoholism. However, appellant provided the information
for that medical history. 

Detective Jerry Lawing of the Rockport Police Department was assigned the duty of investigating the complainant's death. 
On May 4, 1999, Lawing informed appellant that a warrant was going to be issue for his arrest. At approximately 5:30
a.m. on May 6, 1999, appellant's neighbor, Michael Horton, saw appellant loading fishing poles and a suitcase and two
poodles into the pickup truck of Charley Johnson and left. Horton never saw anyone again at appellant's home. Lawing
attempted to execute the arrest warrant on May 7, but was unable to locate appellant. On May 12, appellant was later
arrested in Sumas, Washington, which is near the United States-Canadian Border. 

C. Allegations and Elements.

The indictment alleged the offense of murder pursuant to penal code section 19.02(b)(2). The elements of the offense
under that section are:

(1) the actor;

(2) intends to cause serious bodily injury; and

(3) commits an act clearly dangerous to human life;

(4) that results in the death of an individual. 

The indictment alleged, in pertinent part, the following:

appellant on or about the 26th day of April, A.D. 1999, ... while intending to cause serious bodily injury to [the complainant,
did] intentionally and knowingly commit an act clearly dangerous to human life by kicking [the complainant] with his feet,
hitting her with his hands, or striking her with an instrument or instruments unknown to the Grand Jurors, thereby causing
the death of [the complainant].



The application paragraph of the court's charge authorized conviction if the jury found appellant caused the complainant's
death by kicking with feet, hitting with hands, or striking with an instrument or instruments unknown to the grand jury. 

D. Legal Sufficiency.

The issue under the first point of error is whether any rational trier of fact could find the above stated essential elements of
the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. at 318-19, 99 S.Ct. at 2788-2789. At the outset, we
note that the jury returned a general verdict. When such a verdict is returned, the reviewing court will examine the record
to determine if the evidence is sufficient to support a finding of guilt under any of the allegations submitted. If so, the
verdict will be upheld. Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992); Fuller v. State, 827 S.W.2d 919,
931 (Tex. Crim. App. 1992). For example, in the instant cases, if the evidence is sufficient to establish appellant hit the
complainant with his hands and that such conduct constitutes an act clearly dangerous to human life, we need not determine
whether appellant also kicked, and/or struck the complainant with an instrument unknown to the grand jury. (4)



Appellant argues the evidence is insufficient to prove the subdural hematoma which led to the complainant's death was the
result of appellant's conduct rather than from an accidental fall sustained by the complainant. (5) When the evidence is
viewed in the light most favorable to the jury's verdict, the evidence establishes the following: The complainant's badly
bruised body showed signs of assaultive conduct toward her; so much so that she sustained defensive injuries consistent
with attempts to ward off the attack(s). Galbreath saw knuckle marks to the complainant's temples, and testified her
injuries indicated facial trauma from being hit multiple times over a sustained period of time. The complainant stated she
was often beaten by appellant, and appellant admitted the same to Charley Johnson two years before the fatal injury. Kareh
testified that hitting someone in the head was an act clearly dangerous to human life. White testified that the complainant's
injuries were the result of an assault rather than a fall because the multiple points of impact "on the right side, across the
front, the top, and on the left side" of the complainant's head were not consistent with an individual falling down one time. 
White stated the hematoma was a serious bodily injury which resulted in the complainant's death. In light of this evidence,
we cannot say the jury's rejection of the hypothesis that the complainant fell was irrational. We hold the evidence is
sufficient to prove the essential elements of the charged offense. The first point of error is overruled.

E. Factual Sufficiency.

Under a factual sufficiency review the evidence is viewed in a neutral light, favoring neither party, instead of in the light
most favorable to the verdict. Clewis,922 S.W.2d 134. In this neutral light, "the appellate court reviews the fact finder's
weighing of the evidence and is authorized to disagree with the fact finder's determination." Id. at 133. However, this
review must employ the appropriate level of deference to prevent the appellate court from substituting its judgment for that
of the fact finder. Johnson, 23 S.W.3d at 7. This level of deference must be proportionate with the facts that can be
accurately gleaned from the trial record. Id.at 8. Consequently, a factual sufficiency analysis can consider only those
matters bearing on credibility that can be fully determined from a cold appellate record. Id.(citing George E. Dix & Robert
O. Dawson, 42 Texas Practice--Criminal Practice and Procedure § 36.69 (Supp. 1999)). We consider and weigh all the
evidence and set aside the verdict if we conclude the evidence is insufficient or if the verdict is so against the great weight
and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some evidence of
probative force in support of the verdict. See Pool v. Ford Motor Co., 715 S.W.2d at 635. Under this standard, if the
complaining party is attacking the factual sufficiency of an adverse finding on an issue to which he did not have the burden
of proof, he must demonstrate that there is insufficient evidence to support the adverse finding. Johnson, 23 S.W.3d at 7.

Evidence was offered in support of two separate and mutually exclusive theories, either appellant murdered the
complainant, or she died after falling. To support the former, the State offered evidence from acquaintances, emergency
medical personnel, nurses, doctors and law enforcement personnel to prove that appellant battered the complainant over a
sustained period of time, the abuse ending when appellant struck the complainant causing a subdural hematoma which
ultimately caused death. In support of the latter, appellant offered evidence to establish that the complainant was a chronic
alcoholic who often fell, and who on a prior occasion in the early 1990s had fallen and received a subdural hematoma. This
evidence was provided through statements from the complainant who later made contradictory statements, and by appellant
who told Evanchak the complainant had fallen. Likewise, appellant furnished the medical history from the 1992-93 which
stated the complainant suffered that injury as a result of a fall caused by a seizure brought on by alcoholism.

These two theories presented a credibility choice for the jury and we must defer to that choice unless there are matters
contrary to the verdict which are determinable from the "cold appellate record." Johnson, 23 S.W.3d at 8. This record
simply does not permit us to make that determination. In fact, it draws us to the conclusion that the jury's verdict was
correct in light of White's opinion that the complainant's liver did not support the conclusion that she was a chronic
alcoholic. Therefore, we do not find the jury's verdict to be so against the great weight and preponderance of the evidence
as to be manifestly unjust. Accordingly, we hold the evidence is factually sufficient to support the jury's verdict. The
second point of error is overruled.



II. Extraneous Offense Evidence.

The third point of error contends the trial court erred in admitting the testimony of Katherine Miller, the barmaid at Kitty's,
who overheard a conversation between appellant and Charley Johnson wherein appellant admitted slapping the complainant
"so hard that she fell and hit the dishwasher door, and that it left ... a golf ball sized egg on her head." Appellant raises two
arguments: first, that the evidence was inadmissible under Rule 404(b) of the Rules of Evidence; and, second, that the trial
judge did not conduct the required balancing test under Rule 403 of the Rules of Evidence. We review the trial court's
ruling whether to admit evidence under an abuse of discretion standard. Wilks v. State, 983 S.W.2d 863, 866 (Tex.
App.-Corpus Christi 1998, no pet.). The trial court's ruling will be upheld so long as that decision lies within the zone of
reasonable disagreement. Rachal v. State, 917 S.W.2d 799, 807 (Tex. Crim. App. 1996).

This issue first arose during the pretrial hearing on appellant's motion in limine. At that time, the State offered the
following explanation for its need of the complained of testimony:

It is going toward the intent, the opportunity and the motive of the Defendant to have committed this crime. There are
some alleged acts that have occurred in the past that people were witnesses to, and they will be highly relevant in this case. 
Without going into specifics, the evidence of this opportunity to commit the crime, his motive to commit the crime, the
manner in which he exercised his control and will over this - the victim in this case for a period of seven years roughly,
Judge. All of these things go toward motive, intent and opportunity, Judge.



When the evidence was subsequently admitted before the jury, appellant lodged a timely and specific objection which
comports with his point of error. The trial court ultimately charged the jury on this issue as follows:

You are instructed that if there is any testimony before you in this case regarding the defendant's having committed offenses
other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose
unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were
committed, and even then you may only consider the same in determining the intent, motive or opportunity of the
defendant, if any, in connection with the offense alleged against him in the indictment in this case, and for no other purpose.



As noted above, the evidence established the complainant was assaulted. From the bruising observed on the complainant
as well as the medical testimony from Kareh and White, the complainant sustained this assaultive conduct over a prolonged
period of time. The question remained, however, who was the perpetrator. In other words, who had the intent and
opportunity to assault the complainant.

The evidence established that the complainant sustained a subdural hematoma in the early 1990s. The person who
provided the medical history related to that injury was appellant who stated it was caused by an accidental fall. The
evidence further showed that the complainant lived as a recluse, alone with appellant. She was unkept and rarely left her
home. Her daughter, Diane Sumners lived out-of-state and rarely visited. The complainant's sole visitor appears to have
been Marie Dimsdale, a neighbor, who visited the complainant twice in April, 1999, and testified the complainant "always
seemed to be afraid" of appellant. Finally, when Rhonda Evanchak, the emergency medical technician, arrived at the
complainant's home, appellant explained the complainant had fallen.

In light of this evidence, we find the testimony of Katherine Miller relating appellant's admitted assault of the complainant
was admissible to establish intent and opportunity and was not offered to prove appellant's character and that he acted in
conformity therewith. Tex. R. Evid. 404(b). Therefore, we hold the extraneous offense evidence was admissible apart from
supporting an inference of character conformity. Montgomery v. State, 810 S.W.2d 372, 387 (Tex. Crim. App. 1990) (Op'n
on Reh'g). We further find the relevance of Katherine's testimony on the issues of intent and opportunity was not
substantially outweighed by the danger of unfair prejudice. Tex. R. Evid. 403. Finally, we find the State, the proponent of
the evidence, satisfied the trial court at the motion in limine hearing that the evidence was relevant apart from its tendency
to prove character conformity. Montgomery, 810 S.W.2d at 387. Based upon these finding, we hold the trial court did not
abuse his discretion in admitting the complained of testimony. Wilks, 983 S.W.2d at 866; Rachal, 917 S.W.2d at 807. The
third point of error is overruled.

The judgment of the trial court is affirmed.

 ___________________________

CHARLES F. BAIRD

Justice



Do not publish .

Tex. R. App. P. 47.3.



Opinion delivered and filed

this 25th day of October, 2001.

 

1. Former Court of Criminal Appeals Judge Charles Baird assigned to this Court by the Chief Justice of the Supreme Court
of Texas pursuant to Tex. Gov't Code Ann. § 74.003 (Vernon 1998).

2. Additionally, appellant has filed a pro se supplemental brief. However, appellant is not entitled to hybrid representation. 
Patrick v. State, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995), cert. denied, 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d
475 (1996) (citing Landers v. State, 550 S.W.2d 272, 280 (Tex. Crim. App. 1977), op'n on rehearing). Therefore, we will
not address the issues raised therein. This is not to suggest that appellant is precluded from raising those issues by way of
habeas corpus. Ex parte Varelas, 45 S.W.3d 627 (Tex. Crim. App. 2001).



3. Specifically, White testified that the complainant's liver rather than being yellow and hard due to scarring and cirrhosis,
was grossly normal. Nevertheless, White could not say that the complainant had not been a chronic alcoholic. 

4. Regarding the latter allegation, we pause here to note that when an indictment alleges that the manner and means used to
commit a crime are unknown to the grand jury, the State must prove that the grand jury attempted to determine the exact
means used in the offense, but was unable to do so. See Mack v. State, 772 S.W.2d 162, 167 (Tex.App.--Dallas 1989, no
pet.) (citing Pike v. State, 758 S.W.2d 357, 367 (Tex.App.--Waco 1988, no pet.)). This must be proven just as any other
allegation in the indictment. Mack, 772 S.W.2d at 167 (citing Edlund v. State, 677 S.W.2d 204, 209 (Tex.App.--Houston
[1st Dist.] 1984, no pet.)). In the instant case, there was no proof as to this allegation. Therefore, if this were the only
manner of causation alleged, we would be forced to order a judgment of acquittal.

5. Kareh testified that the complainant ultimately died from cardiac arrest. This does not affect appellant's criminal
liability. A person is criminally responsible for his conduct if the result would not have occurred but for his conduct,
operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the
result and the conduct of the actor clearly insufficient. Tex. Pen. Code Ann. § 6.04(a) (Vernon 1994). Where a wound
causes a disease which produces death, the death is attributable to the wound if there is no evidence of gross neglect or
improper treatment. Turner v. State, 505 S.W.2d 558 (Tex. Crim. App. 1974). Hence, a conviction of murder will be
sustained where the evidence is sufficient to show that the complications from which the victim died were traceable to the
injuries inflicted by the defendant. Jones v. State, 582 S.W.2d 129, 134 (Tex.Cr.App.1979).