Opinion Issued January 13, 2005

















In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00168-CR
____________

ERIC ALFREDO BERRIOS, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 176th District Court
Harris County, Texas
Trial Court Cause No. 933712




MEMORANDUM OPINION

          A jury found appellant, Eric Alfredo Berrios, guilty of the offense of capital
murder.


 Because the State did not seek the death penalty, the trial court
automatically assessed his punishment at confinement for life.


 In four points of
error, appellant contends that the evidence was legally and factually insufficient to
support his conviction and that the trial court erred in submitting instructions in the
jury charge concerning the law of parties and transferred intent. We affirm.
Facts 
          Houston Police Officer P. LeBlanc testified that, on September 29, 2002,
between 4:30 a.m. and 5:00 a.m., he was one of the first crime-scene investigators to
be dispatched to a shooting scene in a large parking lot at the 6300 block of Fairdale
street. However, initially, he first went to a street a block away, where a green Ford
Explorer had stopped after it had fled the parking lot after the shootings. At the
parking lot, Le Blanc saw a body lying on the ground near a red Chevy Blazer and
another body in the driver’s seat of a maroon Dodge Neon. He and another officer
collected about 81 different items at the scene that were admitted into evidence,
namely fired bullets, bullet fragments, and spent shell casings. 
          Benjamin Belmarez, a passenger in the red Chevy Blazer, testified that Adolfo
Rodriguez, the first complainant, was his cousin and the driver of the Blazer. On
September 29, 2002, he and Rodriguez were driving along Richmond street trying to
talk to girls, but, at around 2:00 a.m, police officers began closing off Richmond
street, so Rodriguez drove into a parking lot in order to turn around. A small crowd
of people were standing in front of the parking lot, and two people were pointing to
the back of the parking lot. An unknown man, whom he later identified as Mark
Perez, approached the driver’s side of the Blazer with a handgun. When Perez
stopped at the driver’s side, Belmarez saw Perez shoot the handgun at another car
located in the back of the parking lot. Belmarez did not believe that Perez was
shooting at the Blazer, but Belmarez did not see where Perez was shooting. When
Belmarez started hearing bullets come through the Blazer’s windshield, he turned his
head toward the passenger window and saw another man “with a big rifle shooting
toward the back” of parking lot. Belmarez described this man as a 22-to-25- year-old
Hispanic male, with short hair, dark complexion, and wearing a green shirt. Belmarez
did not see where the man with the rifle was shooting, but the man was not shooting
at the Blazer, and bullets had been hitting the Blazer before he had started shooting. 
When Belmarez was shot in the shoulder, he called for emergency assistance. He
checked on Rodriguez, but Rodriguez had also been shot, had apparently opened his
car door, and had fallen to the ground. Rodriguez died five to ten minutes later. 
Belmarez further testified that the bullet that killed Rodriguez originated from the
front of the Blazer and that he did not see anyone shooting at the Blazer.
          Houston Police Officer M. Kocurek testified that, at about 2:50 a.m., he was
directing traffic at the intersection of Unity and Richmond streets when he noticed a
green Ford Explorer traveling westbound at a high rate of speed approaching the
intersection. The Explorer, with a flat tire and a pluming radiator, stopped at the
intersection, and Colby Martin, the driver, told Kocurek that Mario and Sergio
Rodriguez, two of his passengers, had been shot. Kocurek found no weapons in the
car and saw that the two of the men had, in fact, been shot. 
          Mario Rodriguez, a passenger along with Sergio Rodriguez and two other
friends in the green Ford Explorer, testified that he and his friends tried to drive onto
Richmond street to try to talk with girls. At around 2:00 a.m., police officers began
closing Richmond street, so Martin drove into a parking lot on Fairdale street in order
to turn around. As they drove into the parking lot, they passed a Lexus sports utility
vehicle (SUV) driven by a young female. Both cars had their windows rolled down,
and, as the Explorer slowly drove by the Lexus SUV, Mario said, “What’s up,” to the
female. In response, a man in the passenger seat of the Lexus SUV began swearing
at Mario. Mario then heard about 15 to 20 gunshots, and he was shot twice in his
thigh. He later found eight bullets that had hit the Explorer. Martin drove out of the
parking lot, stopped on Richmond street, and Mario told a police officer that he and
his brother, Sergio, had been shot. Mario testified that he “had no idea that people
were shooting” at the Explorer.
          Eugene Perez testified that he is the brother of Mark and Esteban “Steve”
Perez. On September 28, 2002, at around 11:00 p.m., he, his two brothers, Arthur
Jurado, Joseph “ChooChoo” Martinez, Angel “Peewee” Resendez, two girls named
Veronica and Rachel, Johnny and Doug Gomez, Annalee Pena, and appellant went
to T-Town, a club on Richmond street. Right before the bar closed, Martinez was
thrown out of the club for hitting a bouncer, and one of Eugene’s brothers was thrown
out for fighting. After leaving the club, everyone in the group, except Martinez,
congregated at the parking lot at 6330 Fairdale to retrieve their cars. Eugene had
driven Doug Gomez’s grey Chevrolet Impala to the parking lot, along with Veronica
and Rachel, so once he arrived at the parking lot, Eugene retrieved the keys to his red
S-10 truck from either Steve or Mark Perez, who had driven his truck to the club. 
Eugene and Steve then got into the S-10 truck, and Mark got into Pena’s Lexus SUV
as a passenger. Resendez had driven to the club in a silver Pontiac Sunfire, along
with appellant and Jessica, appellant’s girlfriend. Johnny and Doug Gomez were
going to drive home in their Impala. As Eugene sat in Rachel’s car with Pena and
Rachel, he “heard something going on,” and then “everyone got out of their cars.” 
He then saw Mark standing in the front of the parking lot and saw a green Ford
Explorer parked next to Mark. Eugene believed that a fight was going to occur
because he saw Johnny and Doug Gomez running toward Mark. Mark and Johnny
“were chasing after the Explorer towards the back,” and Eugene saw that Johnny was
carrying an assault rifle. Johnny ran in front of Eugene and shot toward the back of
the parking lot a couple times before Eugene ducked down. He heard about 30 to 40
shots, and he then saw Steve take the assault rifle away from Johnny and carry it into
Eugene’s truck while Steve got into the truck. Eugene drove Steve to their house. 
          Eugene further testified that, although he believed that appellant had used an
assault rifle, he did not see appellant with an assault rifle, did not know if appellant
had been carrying a weapon, and did not see appellant in the back of the parking lot. 
However, later, at the Perez’s house, Eugene heard appellant “say that [appellant] 
had shot his gun when John Gomez shot his” and also heard appellant and others say
that “they might have shot the wrong people.” Eugene stated that he told police
officers that appellant said that [appellant] had “dumped on people,” which Eugene
explained meant “shoot.” Eugene also stated that the target of the shooting was the
green Ford Explorer that had driven by Pena’s Lexus SUV. When the State offered
three surveillance tapes of the shootings into evidence, Eugene identified, on
videotape, Johnny carrying an assault rifle, Steve taking the rifle away from Johnny,
and Mark running where “the dudes in that Explorer had took off.” Although he did
not see appellant in the back of the parking lot, Eugene, after viewing the surveillance
tape, identified appellant as the man who had walked up to the passenger side of
Eugene’s S-10 truck, had reached into the window, and had walked around the truck,
holding an assault rifle. Eugene stated, however, that appellant did not get the rifle
from Eugene’s truck. Eugene explained that he and his friends were a “close-knit
group” and that “if anyone got in a fight, you know, as long as no one jumped in, you
know, no one would jump in unless one of their friends or whatever would get in,
then yes, we would defend ‘em.” 
          Arthur Jurado testified that, at the T-Town club, appellant had started a fight
by punching Pena’s ex-boyfriend in the face, and everyone was thrown out of the
club. Afterward, when Jurado joined the rest of the group at the parking lot, he saw
Mark, who was a passenger in Pena’s Lexus SUV, get into a conversation with the
occupants of the green Ford Explorer. Jurado saw Mark get out of the Lexus SUV,
throw his hands up, and yell at the Explorer’s occupants. Still yelling, Mark then
headed toward the back of the parking lot, where the Explorer had driven. Jurado
thought a fight was going to occur, so he and Steve walked toward Mark, who was
holding a .40 caliber handgun. When Johnny, who was standing in front of a red
Chevy Blazer, started firing an assault rifle, Mark started firing the handgun. Jurado
then saw Steve take the assault rifle away from Johnny and both men run back toward
their cars. He also saw appellant running back toward the group’s cars, carrying a
black rifle. Jurado further testified that he had seen appellant, three or four days
earlier at the Perez’s house, with the same rifle, “showing it off.” He did not see
appellant shoot the rifle, but appellant, on the following day, told him that “he had
messed up.”
          Annalee Pena testified that, when she and Mark were leaving the parking lot,
the occupants of the Explorer tried to talk to her, and Mark, who was reclining in the
passenger seat, became mad and exchanged words with the Explorer’s occupants. 
When Mark left her Lexus SUV, he did not have a weapon, but she saw Johnny with
a rifle. Mark and Johnny then started toward the back of the parking lot, and Pena
heard shots within seconds. She did not know where appellant was when they were
at the parking lot, and she did not see him with a gun. Pena acknowledged that, in her
first statement to police officers, she had not mentioned the shooting at all because
she had been scared. However, in her second statement to police officers, Pena stated
that Johnny and appellant had each carried “large, long guns,” but she was “not
positive if it was [appellant].” She also explained that the Perez brothers told her that
appellant also had a rifle. 
          Carlos Hernandez, a passenger in the maroon Dodge Neon in which the second
complainant, Isai Mares, was shot and killed, testified that, when Mares drove into
the parking lot, Hernandez heard what he thought were firecrackers. However, he
then saw two people in the middle of the parking lot shooting at a green Ford
Explorer as the Explorer passed Mares’s car. One person had “an A.K. and the other
had a rifle.” Mares tried to drive out of the parking lot, but a bullet struck Hernandez
in the shoulder and head, and Mares was bleeding from his ear and showed “no signs
of life.”
          Houston Police Sergeant P. Motard, a homicide detective, testified that two
different kinds of shell casings were found at the scene: rifle-type casings and pistol
casings. When he spoke with Mark, Mark identified himself as the shooter of a .40
caliber handgun at the scene and identified Johnny and appellant as each having a
rifle. Mark stated that their target had been the green Ford Explorer. Furthermore,
he confirmed that three different weapons had been used at the scene: one handgun
and two rifles. In a sworn statement, Johnny also admitted that he had shot his rifle
at the scene on the night of the incident. 
          Angel Resendez testified that he picked up appellant and appellant’s girlfriend,
Jessica, at appellant’s house and drove to the T-Town club in his car. After a fight
between Mark and an unknown person, his group of friends, including appellant, was
kicked out of the club. Resendez, appellant, and Jessica then drove to the parking lot. 
As Resendez was getting ready to leave the parking lot in his car, he saw Mark
running toward the back of the parking lot because “somebody said something to
Mark’s girlfriend.” Resendez got out his car because he thought that they were going
to fight. He explained that “if one of us fights all of us fight.” He told appellant that
“we’re going to fight” and “let’s go fight.” Resendez, without appellant, ran toward
the back of the parking lot, where Mark and Steve were running. He heard shots in
front of him and then saw Johnny shooting a “S.K.S. or A.K.” and saw Mark shooting
a .40 Glock. He did not see anyone else shooting, and he did not remember seeing
appellant in the parking lot with a rifle. However, when Resendez ran back to his car,
he saw that appellant was right behind him carrying a rifle, either an “A.K. or S.K.S.,”
that was different from Johnny’s rifle. Appellant got into the back seat with the rifle,
and “[b]ecause [Resendez] never [has] guns in [his] car,” Resendez asked appellant,
“[w]hat the fuck was that[?]” In response, appellant said, “I’m sorry.” When
Resendez took appellant back to appellant’s house, appellant took the rifle with him. 
However, Resendez did not know from where appellant retrieved the rifle. 
          Although Resendez testified that he had not seen appellant running toward the
back of the parking lot, he, in a previous statement to police officers, stated that he
had, in fact, seen appellant running toward the back of the parking lot with a gun. 
Moreover, after a lunch break at trial, Resendez further testified that he had seen
appellant running toward the back of the parking lot while carrying a rifle. Resendez
explained that he had lied earlier because he did not want to get appellant into
trouble, and he changed his testimony because he was afraid that perjury charges
would be filed against him. Resendez, however, did not see appellant shoot the rifle
that night. 
          Doug Gomez testified that he saw Johnny fire an assault rifle and that he finally
got Johnny to stop firing. Someone took the rifle away from Johnny, but Doug did
not see who that person was. When he and Johnny were “running back,” Doug heard
gunshots coming from behind. He did not see appellant firing the rifle, but he
“figured [appellant was shooting because [appellant was] the only one back there with
a rifle.” Doug did see appellant run with an assault rifle toward Resendez’s car. 
          Doctor H. Narula, a Harris County assistant medical examiner, testified that he
performed autopsies on both Rodriguez and Mares. The cause of Rodriguez’s death
was gunshot wounds to the head and back, and the cause of Mares’s death was a
gunshot wound to the face and neck, both of which were consistent with the use of
a firearm. Furthermore, in Narula’s opinion, the gunshot wounds to both
complainants were caused “more consistently” by a rifle than by a handgun. 
          Darrell Stein, a Houston Police Department firearms examiner, testified that
two different calibers of shell casings were found at the scene: (1) .40 Smith and
Wesson caliber, which is a handgun caliber, and (2) 7.62-by-39 millimeter Russian
caliber, an assault rifle caliber. He did not have a “source weapon” that had fired any
of the spent shell casing that he had examined. However, he testified that the
evidence was more consistent with the complainants being shot with a rifle, as
opposed to a handgun. Furthermore, 58 of the shell casings came from two different
rifles, and both complainants were shot with two different rifles. 

Sufficiency of the Evidence
          In his first and second points of error, appellant argues that the evidence was
legally and factually insufficient to support his conviction as a party because the State
presented no evidence to show that appellant “entered into an agreement” to
intentionally or knowingly cause the death of two people during the same transaction
and that the evidence only supports a finding that appellant acted, if he did,
“independently in causing the death of Isai Mares.”
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine if any rational fact finder could have
found the essential elements of the offense beyond a reasonable doubt. King v. State,
29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In a legal sufficiency review, we may
not substitute our own judgment for that of the fact finder. Id. Furthermore, when
the trial court’s charge authorizes the jury to convict on more than one theory, the
verdict of guilty will be upheld if the evidence is sufficient on any one of the theories.
Guevara v. State, No. 0424-03, 2004 WL 2347793, at *2 (Tex. Crim. App. Oct. 20,
2004); see Rabbani v. State, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992).
           In our review of the factual sufficiency of the evidence, we view all of the
evidence neutrally, not in the light most favorable to the verdict, and we will set aside
the verdict “only if the evidence is so weak that the verdict is clearly wrong and
manifestly unjust, or the contrary evidence is so strong that the standard of proof
beyond a reasonable doubt could not have been met.” Escamilla v. State, 143 S.W.3d
814, 817 (Tex. Crim. App. 2004); see Johnson v. State, 23 S.W.3d 1, 6-7 (Tex. Crim.
App. 2000). Although our analysis considers all the evidence presented at trial, the
trier of fact is the exclusive judge of the facts, the credibility of the witnesses, and the
weight to be given to their testimony. Sharp v. State, 707 S.W.2d 611, 614 (Tex.
Crim. App. 1986). Unless the available record clearly reveals a different result is
appropriate, an appellate court must defer to the jury’s determination concerning what
weight to give contradictory testimonial evidence because this resolution often turns
on an evaluation of the credibility and demeanor of the witnesses, and the jurors were
in attendance when the testimony was delivered. Johnson, 23 S.W.3d at 8.
          A person commits the offense of capital murder if the person murders more
than one person during the same criminal transaction. Tex. Pen. Code Ann.
§ 19.03(a)(7)(A) (Vernon Supp. 2004-2005). 
          Under the law of parties, a person is “criminally responsible as a party to an
offense” if the offense committed “by his own conduct, by the conduct of another for
which he is criminally responsible, or by both.” Id. § 7.01(a) (Vernon 2003). Each
party to an offense may be charged with commission of the offense. Id. § 7.01(b)
(Vernon 2003). A person is “criminally responsible” for an offense committed by the
conduct of another if, acting with intent to promote or assist the commission of the
offense, he solicits, encourages, directs, aids, or attempts to aid the other person to
commit the offense. Id. § 7.02(a)(2) (Vernon 2003).
          To establish guilt under the law of parties, the evidence must show that, at the
time of the offense, the parties were acting together, each contributing some part
towards the execution of their common purpose. See Ransom v. State, 920 S.W.2d
288, 302 (Tex. Crim. App. 1994); Ahrens v. State, 43 S.W.3d 630, 633-34 (Tex.
App.—Houston [1st Dist.] 2001, pet. ref’d). In determining whether a defendant
participated in an offense as a party, the fact finder may examine the events occurring
before, during, and after the commission of the offense and may rely on actions of the
defendant that show an understanding and common design to commit the offense. 
Ransom, 920 S.W.2d at 302; Ahrens, 43 S.W.3d at 633-34. Each fact need not point
directly and independently to the guilt of the appellant, as long as the cumulative
effect of all the incriminating facts are sufficient to support the conviction. Guevara,
2004 WL 2347793, at *3; see Alexander v. State, 740 S.W.2d 749, 758 (Tex. Crim.
App. 1987). Intent may also be inferred from circumstantial events, such as acts,
words, and the conduct of the defendant. Guevara, 2004 WL 2347793, at *3; Patrick
v. State, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). We note that proof beyond
a reasonable doubt that appellant actually fired the fatal shots is not necessary to
support a capital murder conviction where the jury was charged on the law of parties. 
Rabbini, 847 S.W.2d at 558.
Legal Sufficiency
          Appellant asserts that (1) Adolfo Rodriguez’s murder “was clearly committed
individually by Johnny Gomez without any assistance or agreement before the
shooting by the appellant”; (2) “there was no evidence of any communication
between Mark Perez and Johnny Gomez and the appellant, [] regarding using deadly
weapons or agreement to kill two people”; (3) “[o]bviously, if Johnny Gomez
committed one of the killings individually, then [appellant], as a matter of law cannot
be held guilty of the offense of capital murder of killing two individuals as a party to
the offense as the facts that Adolfo Rodriguez was killed before [appellant], if he did,
participated in any offense”; and (4) “[appellant], [] if he shot at all, did not shoot at
the same vehicle that Johnny Gomez did and clearly did not kill Adolfo Rodriguez.”
Appellant further asserts that “[t]he evidence clearly shows that [appellant] was acting
independently, if he did, when shooting into a crowded parking lot.” Thus, appellant
concludes that “[i]f the evidence that [appellant] was the shooter and it was his rifle
that cause[d] the death of Isai Mares, then what appellant would be guilty of would
be intentionally and knowingly caus[ing] the death of an individual by committing
an act clearly dangerous to human life,” and he cannot be guilty of “intentionally and
knowingly caus[ing] the death of two individuals during the same transaction.”
          However, the evidence shows that, at the time of the offense, appellant, along
with Mark Perez and Johnny Gomez, contributed in shooting at the occupants of the
green Ford Explorer, killing the complainants in the process. The evidence reveals
that appellant was more than merely present when the complainants were killed and
that he was an active participant in the shootings at the parking lot. Eugene Perez,
at trial, and Mark Perez, in his statement to Sergeant Motard, expressly stated that the
“target” of the group that night was the green Ford Explorer. Arthur Jurado, Annalee
Pena, and Angel Resendez testified that they all knew that a fight was going to occur
after Mark Perez exchanged words with the Explorer’s occupants. Resendez, who
was in his car with appellant, testified that, when he saw Mark Perez go toward the
back of the parking lot where the green Ford Explorer had driven, he told appellant
that “we’re going to fight” and “let’s go fight.” Resendez saw appellant, who was
carrying a rifle, run toward the back of the parking where Mark Perez and Johnny
Gomez were running. Moreover, Resendez saw that appellant was still carrying the
rifle when appellant returned to Resendez’s car. 
          Eugene Perez testified that, at the Perez’s house after the shootings, he heard
appellant say “that [appellant] had shot his gun when John Gomez shot his” and that
appellant had “dumped on people.” (Emphasis added.) Eugene also heard appellant,
along with others, say that “they might have shot the wrong people.” (Emphasis
added.) Jurado saw appellant running back toward their friends’ cars carrying a black
rifle, and he had previously seen appellant at the Perez’s house with the same rifle
three or four days prior to the shootings. Jurado further testified that, the day after
the shootings, appellant told him that “[appellant] had messed up.” Doug Gomez saw
appellant running with an assault rifle toward Resendez’s car, and, although he did
not see appellant fire the rifle, Gomez “figured [appellant] was shooting because
[appellant was] the only one back there with a rifle.” Pena testified that she told
police officers in her second statement that appellant was carrying “large, long
gun[s]” but was not positive whether the man was, in fact, appellant. 
          Darrell Stein, a firearms expert, testified that the complainants were shot with
rifles, not a handgun, and that both complainants were shot with a different rifle. Dr.
Narula testified that the complainants’ gunshot wounds were more consistent with
shots from a rifle, as opposed to a handgun. Sergeant Motard testified that Mark
Perez confirmed that two rifles and one handgun were used at the scene. Carlos
Hernandez testified that the men shooting at the green Ford Explorer each had an
assault rifle. 
          Finally, Eugene Perez testified that he and his friends were a “close-knit group”
and that “if anyone got in a fight, you know, as long as no one jumped in, you know,
no one would jump in unless one of their friends or whatever would get in, then yes,
we would defend ‘em,” and Resendez stated that “if one of us fights all of us fight.”
          Considering this evidence, a rational fact finder could have found, beyond a
reasonable doubt, that appellant acted with the intent to promote or assist the
commission of the offense of capital murder and that appellant encouraged, aided, or
attempted to aid Mark Perez and Johnny Gomez in the commission of the offense. 
Thus, we hold that the evidence was legally sufficient to support appellant’s
conviction for capital murder under the law of parties. 
          We overrule appellant’s first point of error.
Factual Sufficiency
          Appellant also argues that his assertions made under his legal sufficiency point
of error show that “there was absolutely no evidence” to support the finding that
appellant committed “the offense of capital murder as a party wherein he would have
had to have made an agreement with either Mark Perez or Johnny Gomez to commit
the killing of two different people during the same transaction.” Appellant notes that
Benjamin Belmarez did not see anyone shooting at the red Chevy Blazer and that
Eugene Perez did not see appellant with an assault rifle while at the parking lot and
did not know whether appellant had even been carrying a weapon. Also, Annalee
Pena was not positive as to whether appellant had been carrying a rifle on the night
of the shootings. Moreover, Angel Resendez and Doug Gomez did not see appellant
fire the rifle that they saw appellant carrying. Darrell Stein did not have a “source
weapon” that had fired any of the spent shell casings that he had examined. 
          However, there is ample evidence to support the jury’s determination that
appellant was guilty of the offense of capital murder as a party. Angel Resendez
testified that he told appellant that “we’re going to fight” and “let’s go fight, ” that he
saw appellant, while carrying a rifle, run toward the back of the parking lot, and that
appellant was carrying the same rifle when appellant returned to Resendez’s car. 
Eugene Perez, at the Perez’s house after the shootings, heard appellant say “that
[appellant] had shot his gun when John Gomez shot his,” that appellant had “dumped
on people,” and that “they might have shot the wrong people.” (Emphasis added.) 
Arthur Jurado saw appellant running back toward their friends’ cars carrying a black
rifle and that, the day after the shootings, appellant told him that “[appellant] had
messed up.” Doug Gomez saw appellant running with an assault rifle. Furthermore,
Darrell Stein stated his opinion that the complainants were shot with rifles, not a
handgun, and that both complainants were shot with a different rifle. Sergeant
Motard testified that Mark Perez confirmed that two rifles and one handgun were
used at the scene, and Carlos Hernandez testified that the men shooting at the green
Ford Explorer each had an assault rifle. Finally, Eugene Perez testified that he and
his friends were a “close-knit group” and that his friends and brothers possessed a
group mentality concerning fighting by testifying that “if one of us fights all of us
fight.”
          As the exclusive judges of the facts, the credibility of the witnesses, and the
weight to be given their testimony, the jury was free to believe or disbelieve all or any
part of the State’s witnesses’ testimony. McKinny v. State, 76 S.W.3d 463, 468-69
(Tex. App.—Houston [1st Dist.] 2002, no pet.). Where conflicting testimony is
given, as in this case, it is the exclusive province of the jury to reconcile conflicts in
the evidence. Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).
Viewing all of this evidence neutrally, we conclude that the evidence was not so weak
that the verdict was clearly wrong or manifestly unjust and that the contrary evidence
was not so strong that the standard of proof beyond a reasonable doubt could not have
been met. Accordingly, we hold that the evidence was factually sufficient to support
the jury’s finding that appellant, with the intent to promote or assist Mark Perez and
Johnny Gomez in committing the offense of capital murder, encouraged, aided, or
attempted to aid Mark Perez and Johnny Gomez in murdering Adolfo Rodriguez and
Isai Mares in the same criminal transaction. 
          We overrule appellant’s second point of error.
Instructions in the Jury Charge
          In his third and fourth points of error, appellant contends that the trial court
erred in instructing the jury in the charge on the law of parties and transferred intent 
over his objections. See Tex. Pen. Code Ann. §§ 7.01, 7.02 (Vernon 2003). 
Law of Parties
          Appellant asserts that the State has “failed to show any evidence sufficient to
charge the jury on parties that appellant encouraged the commission of the offense
(capital murder) by words or other agreement” and that “[t]he evidence clearly
supports the proposition, if you believe [appellant] was a shooter, then he participated
in an offense individually and should not be held accountable or responsible for the
acts and conduct of Mark Perez and/or Johnny Gomez.”
           In the instant case, the application paragraph of the court’s charge authorized
the jury to convict appellant for the offense of capital murder if it found that appellant
was the primary actor or was a party to the offense of capital murder. A jury charge
on the law of parties is appropriate when the evidence indicates that a defendant
encouraged, directed, or aided another in the commission of the offense. Bryant v.
State, 982 S.W.2d 46, 49 (Tex. App.—Houston [1st Dist.] 1998, pet. ref’d). In
determining whether a charge on the law of parties is proper, the trial court may
examine the events occurring before, during, or after the commission of the offense,
and may rely on actions of the defendant which show an understanding and common
design to commit the offense. Ransom, 920 S.W.2d at 302; Ahrens, 43 S.W.3d at
634. 
          In McCuin v. State, 505 S.W.2d 827 (Tex. Crim. App. 1974), the following
standard was articulated concerning when an instruction on the law of parties should
be submitted to the jury: 
Where the evidence introduced upon the trial of the cause shows the
active participation in the offense by two or more persons, the trial court
should first remove from consideration the acts and conduct of the non-defendant actor. Then, if the evidence of the conduct of the defendant
then on trial would be sufficient, in and of itself, to sustain the
conviction, no submission of the law of principals [now, parties] is
required. 

On the other hand, if the evidence introduced upon the trial of the cause
shows, or raises an issue, that the conduct of the defendant then upon
trial is not sufficient, in and of itself, to sustain a conviction, the State’s
case rests upon the law of principals [parties] and is dependent, at least
in part, upon the conduct of another. In such a case, the law of
principals [parties] must be submitted and made applicable to the facts
of the case. 
 
Id. at 830. This standard was reaffirmed in Brown v. State, 716 S.W.2d 939, 944
(Tex. Crim. App. 1986). See also Goff v. State, 931 S.W.2d 537, 544-45 (Tex. Crim.
App. 1996). 
          A trial court’s charge to a jury must distinctly set forth “the law applicable to
the case.” Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon Supp. 2004-2005). Here,
as noted above, sufficient evidence was produced during the course of the trial which
would warrant a charge on the law of parties. As demonstrated by appellant’s actions
at the parking lot and by his words spoken to Resendez and Eugene Perez after the
shootings, the evidence was sufficient for a rational jury to conclude that appellant
encouraged, aided, or attempted to aid Johnny Gomez and Mark Perez in committing
the offense of capital murder. Again, Resendez saw appellant running with a gun
toward the back of the parking lot in the direction of the green Ford Explorer after
Resendez told appellant “let’s go fight.” Numerous other witnesses testified that
appellant was carrying a rifle at the parking lot. Furthermore, Resendez and Eugene
Perez testified that appellant made several statements indicating that he had shot at
“people” in the parking lot. This evidence shows “an understanding and common
design” to commit the offense of capital murder. See Ransom, 920 S.W.2d at 302;
Ahrens, 43 S.W.3d at 634. The law of parties was applicable to this case, and we
hold that the trial court did not err in charging the jury on the law of parties. 
          We overrule appellant’s third point of error.
Transferred Intent
          Appellant argues that the trial erred in including an instruction concerning
transferred intent in its charge to the jury. An appellant’s brief must contain a clear
and concise argument for the contentions made, with appropriate citations to
authorities and to the record. Tex. R. App. P. 38.1(h). Regarding the trial court’s
inclusion of an instruction concerning transferred intent in the charge, in his brief, 
appellant does not explain how the trial court erred in including such an instruction. 
Furthermore, appellant provides no legal authority in support of his contention that
the trial court erred. See Alvarado v. State, 912 S.W.2d 199, 210 (Tex. Crim. App.
1995); see also Foster v. State, 101 S.W.3d 490, 499 (Tex. App.—Houston [1st 
Dist.] 2002, no pet.). It is not the appellate court’s “task to speculate as to the nature
of an appellant’s legal theory.” Alvarado, 912 S.W.2d at 210. Thus, regarding the
trial court’s inclusion of a transferred-intent instruction, we hold that appellant has
not presented any error for our review. See Foster, 101 S.W.3d at 499. 
          We overrule appellant’s fourth point of error. 
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice
 
Panel consists of Justices Taft, Jennings, and Bland.
 
Do not publish. Tex. R. App. P. 47.2(b).