

# Fourth Court of Appeals

## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00428-CR

Shawn Michael **LEWIS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2009-CR-2755
Honorable Pat Priest, Judge Presiding

Opinion by:  Rebeca C. Martinez, Justice

Sitting:  Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  April 16, 2014

AFFIRMED

Shawn Michael Lewis appeals his conviction for murder arising out of a shooting on New Year's Eve asserting, among other issues, that he did not have the requisite intent to commit murder.  We overrule Lewis's issues and affirm the trial court's judgment.

## BACKGROUND AND PROCEDURAL HISTORY

On December 31, 2008, approximately fifteen to twenty people were gathered at the home of Shawn Lewis's parents.  A group of young men who had known each other since they were children were present.  Shawn was there, along with his brother Johnny Lewis who was cutting

hair in the garage. They were both friends with Carl Bennett, who was the last haircut of the night. A verbal confrontation involving Craig Griffin, Claude Pinesette, and Pierre Johnson broke out in front of the garage after Pierre arrived. Hearing the loud argument, Johnny walked out of the garage with his SKS assault rifle and tried to calm the situation. Johnny testified he thought Claude had a gun and that Craig was trying to take the gun from Claude to shoot Pierre. However, neither Johnny nor anyone else testified they saw any weapons that night other than Johnny's assault rifle. There was conflicting testimony as to what happened next.

Both Johnny and Craig testified that Shawn grabbed the assault rifle away from Johnny. Craig testified that Shawn pointed the rifle at him and pulled the trigger, but it only "clicked" three times because the safety was on. Shawn then pointed the rifle at the ground and took the safety off. Because Shawn's finger was still on the trigger, the gun began firing. Craig stated the barrel of the gun started "raising up" when it began firing. Craig stated about 20 bullets came out. He was grazed by a bullet in the leg before he got down behind a blue car. After the shooting stopped, Shawn put the rifle in his girlfriend's car and drove away. Carl Bennett, who had come out of the garage and was standing near Craig, was shot several times and killed. Craig admitted initially lying to the police, but then decided to tell the truth about what happened.

Both Johnny and Pualani "Lani" Poloa, Shawn's girlfriend at the time, testified they heard a single gunshot first before the rapid fire of the assault rifle. Johnny acknowledged that after he came outside with his assault rifle, which was fully loaded with the safety on, Shawn grabbed the rifle out of his hand. But, Johnny insisted that he only saw Shawn pointing the rifle at the ground and did not see Shawn shoot the rifle. However, Johnny agreed that if 19 shell casings were later found, they must have come from his gun because it was the only assault rifle there that night. Johnny testified he ran inside when the shooting began and came back out after it stopped. He

saw Carl on the ground and tried to help him. Shawn was not there and did not come back that night. Johnny never saw his assault rifle again.

Lani's testimony differed in that she stated Shawn had told her it was time to leave and they were standing near her car when the shooting started. She testified that Shawn was not anywhere near the source of the shooting. She confirmed seeing Johnny holding his assault rifle and trying to diffuse the argument in the front yard; she did not see any other guns that night. After she heard a single gunshot, Johnny ran past her toward the house, knocking her to the ground where she stayed until the other rapid-fire shooting stopped. Johnny did not have his assault rifle when he knocked her down. After the shooting stopped, she and Shawn got in her car and left.

Carl Bennett was shot in the head, as well as his thigh and each wrist, and died at the scene. Johnny, Craig, and Claude remained at the scene and spoke to police. Shawn did not return to the house and the assault rifle was never recovered. Shawn was subsequently indicted for Bennett's murder. A jury found him guilty and the court sentenced him to 35 years' imprisonment.

**ANALYSIS**

On appeal, Shawn Lewis raises several issues, contending that (1) the trial court erred in failing to dismiss the indictment for the State's failure to afford him a speedy trial, (2) the evidence is insufficient to support a finding that he engaged in intentional and knowing conduct, rather than merely reckless conduct, (3) the prosecutor's withholding of exculpatory evidence constituted prosecutorial misconduct, (4) the jury charge allowed conviction on an unlawful basis, and (5) the court erred in failing to grant his motion for new trial based on newly discovered evidence.

*Speedy Trial*

Lewis asserts he was denied his right to a speedy trial in violation of the federal and state constitutions, and that the trial court erred in denying his motion to dismiss the indictment based on the speedy trial violation. *See* U.S. CONST. amend. VI, XIV; TEX. CONST. art. I, § 10; *see State*

*v. Rangel*, 980 S.W.2d 840, 843 (Tex. App.—San Antonio 1998, no pet.) (speedy trial inquiry is the same under both United States and Texas constitutions). The remedy for a violation of the right to a speedy trial is dismissal of the case. *State v. Johnson*, 821 S.W.2d 609, 612 n.2 (Tex. Crim. App. 1991); *Puckett v. State*, 279 S.W.3d 434, 436 (Tex. App.—Texarkana 2009). In reviewing the trial court's decision on a speedy trial claim, we apply a bifurcated standard in which we review the court's determination of historical facts under the abuse of discretion standard, but review *de novo* the trial court's application of the law to the facts. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008); *Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002). When, as here, the defendant does not prevail on a speedy trial claim, we presume the trial court resolved any disputed fact issues in favor of the State, and we defer to the implied findings of fact supported by the record. *Zamorano*, 84 S.W.3d at 648.

In determining whether a defendant's right to a speedy trial has been violated, we weigh and balance four factors: (1) length of the delay; (2) reasons for the delay; (3) assertion of the right; and (4) prejudice to the defendant resulting from the delay. *Barker v. Wingo*, 407 U.S. 514, 530 (1972) (creating balancing test for reviewing speedy trial claims under federal constitution). Although the speedy trial right under the Texas Constitution exists independently of the Sixth Amendment guarantee, claims of denial of the state speedy trial right are analyzed under the same four *Barker* factors. *Cantu*, 253 S.W.3d at 280 n.16; *see State v. Jones*, 168 S.W.3d 339, 346 (Tex. App.—Dallas 2005, pet. ref'd) (applying *Barker* factors to motion to dismiss for speedy trial violation). Once the *Barker* test is triggered, we analyze the speedy trial claim by first weighing the strength of the *Barker* factors and then balancing their relative weights in light of the conduct of both the prosecution and the defendant. *Cantu*, 253 S.W.3d at 281. None of the *Barker* factors is a necessary or sufficient condition to finding a speedy trial violation. *Id.* Rather, the factors are related and should be evaluated in conjunction with any other relevant considerations. *Id.*

### 1. Length of the Delay

The length of the delay is the triggering mechanism for an analysis of the *Barker* factors. *Barker*, 407 U.S. at 530. The length of the delay is measured from the time the defendant is arrested or formally accused. *Harris v. State*, 827 S.W.2d 949, 956 (Tex. Crim. App. 1992). Texas courts have generally held that a delay of eight months or more is "presumptively prejudicial" and will trigger a speedy trial analysis. *See Zamorano*, 84 S.W.3d at 649 n.26; *see also Orand v. State*, 254 S.W.3d 560, 566 (Tex. App.—Fort Worth 2008, pet. ref'd) (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)) ("Depending on the nature of the charges, a post-accusation delay of about one year is 'presumptively prejudicial.'"). Here, the State concedes, and we agree, that the approximately three-year delay between the date of Lewis's indictment and his trial is sufficiently lengthy to trigger a speedy trial analysis under *Barker*.

### 2. Reason for the Delay

The State bears the initial burden of justifying the delay. *Emery v. State*, 881 S.W.2d 702, 708 (Tex. Crim. App. 1994); *Rangel*, 980 S.W.2d at 843. Different weights are assigned to different reasons for a delay, with a deliberate attempt to delay trial weighing heavily against the State, but more neutral reasons such as negligence or overcrowded dockets weighing against the State, but less heavily. *Zamorano*, 84 S.W.3d at 649-50; *State v. Munoz*, 991 S.W.2d 818, 822 (Tex. Crim. App. 1999). At the hearing on Lewis's motion for speedy trial, the State admitted a series of exhibits showing there were other felonies, including several murder cases, being tried in that court on the dates of Lewis's trial settings. The prosecutor explained that approximately 50 murder cases were transferred to this new trial court when it was created two years ago. As of the hearing date, there were still 30 murder cases pending trial in that court, with the oldest cases being tried first; six or seven of those murder cases were older than Lewis's case. The record shows Lewis's defense counsel filed one motion for continuance in December 2010 when he had eye

surgery, and the State requested no continuances. At the conclusion of the hearing, the trial court found the majority of the delay was caused by the overcrowded trial docket. Since the majority of the delay was caused by a neutral reason, i.e., the overcrowded docket, this factor weighs against the State, but only slightly. *See Prihoda v. State*, 352 S.W.3d 796, 804-05 (Tex. App.—San Antonio 2011, pet. ref'd).

### 3. *Assertion of Right to Speedy Trial*

The third *Barker* factor is the defendant's assertion of his right to a speedy trial. *Barker*, 407 U.S. at 531; *Zamorano*, 84 S.W.3d at 651; *Munoz*, 991 S.W.2d at 825. A defendant is responsible for asserting or demanding his right to a speedy trial. *Munoz*, 991 S.W.2d at 825. A lengthy delay or lack of persistence in asserting the right attenuates a speedy trial claim. *Russell v. State*, 90 S.W.3d 865, 873 (Tex. App.—San Antonio 2002, pet. ref'd). Similarly, a defendant's request for dismissal rather than a prompt trial setting may attenuate the strength of his speedy trial complaint. *Rangel*, 980 S.W.2d at 844. A defendant's timely assertion of his right to a speedy trial is generally weighed against the State, while a defendant's filing of a motion to dismiss is weighed against the defendant. *See Dragoo v. State*, 96 S.W.3d 308, 314 (Tex. Crim. App. 2003).

In this case, Lewis was arrested for Bennett's murder on January 9, 2009. He made bond and was released one month later. On March 25, 2009, Lewis was indicted for the murder, along with three unrelated offenses—aggravated assault with a deadly weapon, aggravated robbery, and hindering apprehension. Bonds were set on those three charges, but Lewis was remanded without bond on the murder charge and remained in jail. On January 25, 2011, Lewis filed a motion requesting a speedy trial. A hearing on the motion was held on October 19, 2011. At the hearing, Lewis's counsel represented that he had been verbally asking for a trial setting all along before filing the written motion. Lewis testified that he had asked his attorney to push for a quick trial and expressed his disappointment with the repeated resets, stating that his memory of the shooting

was dimming and he had lost contact with family members who were present that night. The State initially opposed the motion, but when defense counsel clarified that he was not requesting a dismissal or even the setting of bond, but merely a prompt trial date, the State acquiesced in the granting of the motion. Upon granting the request for a speedy trial, the visiting judge ordered the case to be set for trial "as soon as practical" based on the court's caseload. Lewis's case went to trial five months later on March 12, 2012. At that time, defense counsel moved to dismiss the indictment for failure to provide a speedy trial. Before denying the motion to dismiss and proceeding with trial, the court considered the transcript from the prior speedy trial hearing plus additional evidence presented by the State.

Although the filing of a motion to dismiss may weaken a defendant's claim that he was denied a speedy trial, in this instance Lewis first sought a speedy trial setting through his attorney's verbal requests for a quick trial date and the filing of a written motion for speedy trial. *See Jones*, 168 S.W.3d at 348; *Zamorano*, 84 S.W.3d at 651 n.40; *see also State v. Guerrero*, 110 S.W.3d 155, 161 (Tex. App.—San Antonio 2003, no pet.). At the speedy trial hearing, defense counsel stressed that Lewis was seeking a prompt trial date, not a dismissal or release on bond; the request for a speedy trial setting was granted. Lewis's filing of a motion to dismiss five months later when his case finally went to trial does not undermine his assertion of the right to a speedy trial under these circumstances. Therefore, this third *Barker* factor weighs in favor of Lewis.

### 4. Prejudice Caused by the Delay

Because "pretrial delay is often both inevitable and wholly justifiable," the fourth *Barker* factor examines whether and to what extent the delay has prejudiced the defendant. *Cantu*, 253 S.W.3d at 285 (quoting *Doggett*, 505 U.S. at 656 and citing *Barker*, 407 U.S. at 532). Proof of actual prejudice is not required in situations where the delay is excessive because such a delay "presumptively compromises the reliability of a trial in ways that neither party can prove or even

identify." *Shaw v. State*, 117 S.W.3d 883, 890 (Tex. Crim. App. 2003) (citing *Doggett*, 505 U.S. at 655). Once the defendant makes a prima facie showing of prejudice based on excessive delay, the burden shifts to the State to show the defendant suffered "no serious prejudice beyond that which ensued from the ordinary and inevitable delay." *Munoz*, 991 S.W.2d at 826 (quoting *Ex parte McKenzie*, 491 S.W.2d 122, 123 (Tex. Crim. App. 1973)). A defendant who has made a prima facie showing of prejudice will be entitled to relief unless the presumption of prejudice is (1) persuasively rebutted by the State, or (2) extenuated by the defendant's acquiescence in the delay. *Doggett*, 505 U.S. at 658; *Gonzales v. State*, No. PD-0724-12, 2013 WL 765575, at *1 (Tex. Crim. App. Feb. 27, 2013) (not designated for publication). We have already concluded that the three-year delay was excessive and that Lewis did not acquiesce in the delay because, as discussed above, he asserted his right to a speedy trial. Thus, we must determine whether the State persuasively rebutted the presumption of prejudice caused by the delay.

At the October 2011 speedy trial hearing, Lewis asserted that due to the long delay he had lost contact with his mother, father, and brother, who were potential witnesses because they were present the night of the shooting; he claimed no knowledge of where to find them. At the hearing on Lewis's motion to dismiss, the State admitted a jail recording of a phone call between Lewis and his aunt in which Lewis states that he is not trying to locate any of his family members to testify at trial. The State also presented the testimony of their investigator Roy Beckham who stated that he easily located Lewis's mother, brother Johnny, and sister-in-law at a house in Kerrville, Texas and served them with the State's subpoenas for trial. Beckham stated that Lewis's father was also at the house in Kerrville. After this evidence was presented at the hearing, defense counsel conceded the "unavailability of the witnesses" issue had been resolved by the State's evidence.

With respect to the dimming of Lewis's memory of the details of the offense, the State argued that Lewis had made a DVD statement to police a few days after the murder when his memory was presumably fresh. The State argued that Lewis could refresh his memory by viewing his recorded statement. In addition, the prosecutor argued that Lewis's memory of the events could have been preserved by taking written notes or making a video during defense counsel's many meetings with Lewis about the case while he was in jail awaiting trial. Finally, with respect to anxiety caused by his confinement, the State pointed out that some portions of Lewis's pretrial incarceration were due to the other three pending charges, and that he never filed a motion for bond on the murder charge.

We conclude the State's evidence effectively rebutted the presumption of prejudice by showing that Lewis's defense was not substantially impaired despite the delay in his trial. *See Gonzales*, 2013 WL 765575, at \*1; *Doggett*, 505 U.S. at 654 n.4. Because the State satisfied its burden to persuasively rebut the presumption of prejudice by showing no "serious" impairment to Lewis's defense as a result of the delay, this fourth *Barker* factor weighs in favor of the State. *See Munoz*, 991 S.W.2d at 826.

### *Balancing the* **Barker** *Factors*

While the three-year delay between indictment and trial is presumptively prejudicial, the record shows the reason for the lengthy delay was the overcrowded docket in the trial court, not the actions of the State. Thus, this weighs against the State, but not heavily. Lewis asserted his right to a speedy trial so this factor weighs in favor of Lewis and against the State. As to prejudice, however, we have concluded that the State effectively rebutted the presumption that Lewis's defense was impaired by the delay. The State showed that Lewis's mother, father, brother, and sister-in-law were easily found and served with subpoenas, and that by his own admission Lewis was not attempting to locate and call them as defense witnesses. The record shows Johnny Lewis

in fact testified at trial. Further, Lewis made a DVD statement to police shortly after the murder which recorded his version of the events before time dimmed his memory. Balancing the relative weights of the *Barker* factors, and presuming the trial court resolved any disputed fact issues in favor of the State, we conclude that Lewis failed to show that he was entitled to relief for lack of a speedy trial. *See Cantu*, 253 S.W.3d at 281; *see also Zamorano*, 84 S.W.3d at 648; *Russell*, 90 S.W.3d at 874-75 (affirming denial of speedy trial dismissal when first three factors do not overcome the clear absence of any prejudice). We therefore hold the trial court did not err in denying Lewis's motion to dismiss the indictment based on a speedy trial violation. *See Barker*, 407 U.S. at 522.

### *Sufficiency of the Evidence:  Intentional and Knowing Conduct*

Lewis contends there is legally insufficient evidence to support the jury's finding on the culpability element of murder. Specifically, Lewis argues the evidence shows he pointed the gun at the ground before it started firing and, therefore, the shooting of Bennett was an accident. Lewis asserts he is only guilty of reckless conduct, not knowing and intentional conduct as required to be guilty of murder.

In reviewing legal sufficiency, we consider all the evidence, both direct and circumstantial, in the light most favorable to the verdict to determine whether any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010). The essential elements of the crime are the elements of the offense as defined by the hypothetically correct jury charge for the case, which is one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting

*Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). The law "as authorized by the indictment" consists of the statutory elements of the offense as modified by the charging instrument. *Johnson*, 364 S.W.3d at 294; *Curry v. State*, 30 S.W.3d 394, 404 (Tex. Crim. App. 2000). We must resolve any inconsistencies in the evidence in favor of the jury's verdict, deferring to its assessment of the credibility and weight of the evidence. *Curry*, 30 S.W.3d at 406; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

As applied to this case, the offense of murder is committed when a person intentionally or knowingly causes the death of an individual, or when he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2) (West 2011); *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003) (murder is a result of conduct offense which requires that the culpable mental state relate to the result of the conduct, i.e., causing death). The jury was instructed that it could convict Lewis of murder under either theory of liability.

As noted, supra, there was conflicting testimony about the shooting. In assessing all the witnesses' credibility and weighing all the evidence, the jury could have resolved the conflicts by choosing to believe Craig Griffin's testimony about the shooting and to disbelieve the conflicting portions of the testimony by Lewis's brother and girlfriend. *See Brooks*, 323 S.W.3d at 899 (it is the jury's role to resolve conflicts in the testimony, assess credibility and weigh the evidence, and draw reasonable inferences from the basic facts to the ultimate facts). Griffin testified that after Lewis took the rifle away from his brother, Lewis pointed the rifle at him (Griffin) and pulled the trigger; the gun made three clicks because the safety was on. That action by Lewis supports a reasonable inference that he intended, and unsuccessfully attempted, to shoot Griffin with the assault rifle. Griffin testified that Lewis's next action was to point the rifle down and remove the safety. The intentional conduct of removing the safety further supports the inference that Lewis

- 11 -

intended to shoot Griffin with the assault rifle, thereby causing him serious bodily injury. In addition, Griffin's testimony that Lewis kept his finger on the trigger as he removed the safety, with the result that the gun immediately began firing as the barrel raised up, supports an inference that Lewis was knowingly and intentionally firing the assault rifle at Griffin.

Griffin testified about 20 rounds were fired in his direction. Police recovered 19 shell casings matching the ammunition for the SKS assault rifle at the scene. Griffin stated he was grazed in the leg by one bullet before hiding behind a blue car. Officers testified that a blue Suzuki parked at the scene had multiple bullet holes. Other testimony and evidence showed that Bennett, who was standing next to Griffin, was hit by five bullets, with a shot to the head causing Bennett's death. The use of a deadly weapon, along with the large number of rounds that were fired and the fact that two people were shot, resulting in one's death, supports a finding of intent to kill and/or intent to cause serious bodily injury. *See Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) (use of deadly weapon, particularly firing a semi-automatic rifle, in a tavern filled with people is sufficient to support reasonable inference of specific intent to kill and conviction for intentional or knowing murder); *see also Forest v. State*, 989 S.W.2d 365, 368 (Tex. Crim. App. 1999) (firing a gun in the direction of an individual is an act clearly dangerous to human life within meaning of murder statute). Finally, testimony by Griffin and other witnesses showed that Lewis left the scene immediately after the shooting while Griffin, Claude, and Johnny remained at the scene with Bennett. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (jury may draw inference of guilt from defendant's flight as it evinces a consciousness of guilt).

Viewing the evidence in the light most favorable to the jury's verdict and deferring to the jury's assessments of credibility and weight of the evidence, we conclude there is legally sufficient evidence that Lewis intended to kill Griffin, or to cause Griffin serious bodily injury and fired an assault rifle at him multiple times thereby committing an act clearly dangerous to human life,

which caused an individual's death. TEX. PENAL CODE ANN. § 19.02(b)(2); *Garza Vega v. State*, 267 S.W.3d 912, 915 (Tex. Crim. App. 2008) (if hypothetically correct jury charge would authorize jury to convict on alternative theories of liability, evidence is sufficient if it is sufficient under either theory of liability); *Rabbani v. State*, 847 S.W.2d 555, 558-59 (Tex. Crim. App. 1992). Under the principle of transferred intent, Lewis is criminally responsible for Bennett's death even though the evidence shows Lewis intended to shoot Griffin, not Bennett. TEX. PENAL CODE ANN. § 6.04(b)(2) (West 2011). A classic example of the proper application of transferred intent is when a defendant fires a weapon at an intended victim who is within a group of other people; the offense is murder whether the intended victim is killed or a different person in the group is killed. *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008); *see Bell v. State*, 169 S.W.3d 384, 396 (Tex. App.—Fort Worth 2005, pet. ref'd); *see also Pettigrew v. State*, 999 S.W.2d 810, 812-13 (Tex. App.—Tyler 1999, no pet.) (evidence that innocent bystander was fatally shot during gang confrontation was sufficient to support murder conviction under theory of transferred intent); *Ojeda v. State*, 945 S.W.2d 197, 201 (Tex. App.—San Antonio 1997, no pet.) (intent to harm the intended victim transfers to the actual victim). Under *Malik*, our legal sufficiency analysis includes the law of transferred intent as part of the hypothetically correct jury charge. *See Malik*, 953 S.W.2d at 239-40 (recognizing need for proper sufficiency review to include important concepts such as the law of parties and the law of transferred intent that are not contained in the indictment but would be contained in a hypothetically correct jury charge); *see also Trevino v. State*, 228 S.W.3d 729, 737 (Tex. App.—Corpus Christi 2006, pet. ref'd) (noting that hypothetically correct jury charge under *Malik* would include doctrine of transferred intent under facts of case). Accordingly, we conclude the evidence is sufficient to support the jury's finding that Lewis is guilty of murder.

*Prosecutorial Misconduct:  Withholding Exculpatory Evidence*

Lewis next argues that prosecutorial misconduct in suppressing exculpatory evidence deprived him of due process and requires a new trial.  A *Brady*[1] violation occurs when a prosecutor fails to disclose in a timely manner evidence favorable to the defendant which creates a probability sufficient to undermine confidence in the outcome of the proceeding.  *Pena v. State*, 353 S.W.3d 797, 812 (Tex. Crim. App. 2011); *Thomas v. State*, 841 S.W.2d 399, 404 (Tex. Crim. App. 1992). This duty of disclosure on the State includes favorable information in the possession of the prosecutors as well as police agencies or other members of the prosecutorial team.  *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *see* TEX. CODE CRIM. PROC. ANN. art. 2.01 (West 2005) (prosecution must not suppress facts or secrete witnesses capable of establishing accused's innocence).  In order to establish a *Brady* violation, Lewis must show that (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith, (2) the withheld evidence is favorable to him, and (3) the evidence is material, i.e., there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.  *Ex parte Richardson*, 70 S.W.3d 865, 871 (Tex. Crim. App. 2002); *see Pena*, 353 S.W.3d at 812 ("mere possibility" that undisclosed evidence might have assisted the defense or affected the outcome does not establish materiality in the constitutional sense).

Specifically, Lewis contends the State committed a *Brady* violation by withholding the following evidence: (1) when the police vacuumed the inside of Lani's car they found no gunshot residue ("GSR"); (2) the GSR tests done on Craig Griffin, Johnny Lewis, and Lewis's father Johnny Satterwhite were positive; (3) the report of forensic scientist Tammy Sligh analyzing the shell casings found at the scene and matching them to the ammunition for an SKS assault rifle;

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (State has a duty to disclose all potentially exculpatory information to the defendant).

and (4) Joshua Lewis as a witness to the shooting. The State argues there was no *Brady* violation because the evidence referenced by Lewis was either not shown to exist, was not exculpatory, was disclosed as soon as it became available, or was unknown to the State. We agree.

With respect to the first piece of evidence, when asked on cross-examination, Detective Davila initially testified that Lani's car was vacuumed for GSR and none was found; he agreed a negative result was exculpatory evidence favorable to Lewis. However, when defense counsel asked for the report showing those results, Davila could not find any report in his file. On redirect, Davila conceded that he did not know whether the vacuuming was in fact ever done; he assumed the vacuuming yielded a negative result because he was never given a report showing a positive result. The forensic scientist, Michael Martinez, testified he did not see any evidence that was submitted from vacuuming in this case. Lewis has failed to prove that the exculpatory evidence in fact exists, and has thus failed to prove the State failed to disclose it. *Richardson*, 70 S.W.3d at 871.

Davila also testified he requested GSR testing on every person who was outside at the time of the shooting. With the exception of Johnny's kit which was tested by a colleague in 2009, Martinez testified that he tested the other GSR kits one month prior to trial at the prosecutor's request. The testing found GSR particles on Johnny, Griffin, and Satterwhite. Martinez stated his report was completed on March 6, 2012, the week before trial, and was sent to Davila and the prosecutor that day or the next day. The prosecutor represented to the court that she sent the defense Martinez's report the same day she received it. Based on the record, Martinez's report was not withheld by the State—it was disclosed as soon as it was received. Further, when there is delayed disclosure of evidence favorable to the defense during trial, the defendant's failure to request a continuance waives any *Brady* violation. *Williams v. State*, 995 S.W.2d 754, 761-62 (Tex. App.—San Antonio 1999, no pet.); *Gutierrez v. State*, 85 S.W.3d 446, 452 (Tex. App.—

Austin 2002, pet. ref'd). Lewis did not move for a continuance based on the late completion of the GSR testing and issuance of Martinez's report.

Lewis next complains about the November 20, 2009 forensic firearms report by Tammy Sligh which found that the nineteen shell cartridges recovered from the crime scene all came from the same weapon. The record shows, however, that the State disclosed Sligh's report to defense counsel two years before trial. One of the prosecutors testified that he gave defense counsel a copy of Sligh's report at the April 29, 2010 hearing[2] and documented it in the State's file; the defense did not contradict that testimony. Finally, Lewis complains the State did not disclose the existence of an additional witness to the shooting—his other brother, Joshua Lewis. There is no indication in the record that the State had any knowledge, as apparently neither did Lewis or defense counsel, that Joshua witnessed the events of the shooting.

A *Brady* claim must have some support in the record to show the prosecution's failure to comply with its duty of disclosure. This record contains no such support. Lewis's issue is therefore overruled.

### Jury Charge

Lewis asserts the jury charge contained error because it permitted the jury to find him guilty on an unlawful basis. Specifically, he contends the jury should have been instructed to find him "not guilty" of murder before proceeding to consider whether he was guilty of the lesser-included offense of manslaughter. We disagree. The jury was properly instructed to first consider whether Lewis was guilty of murder and given the applicable elements of murder, and then instructed that, if they had a reasonable doubt as to whether Lewis was guilty of murder, to next consider whether he was guilty of manslaughter. *See* TEX. PENAL CODE ANN. § 19.02 (b)(1),(2). The jury was then

---

[2] The prosecutor also testified he gave defense counsel a copy of the GSR report on Johnny Lewis at the hearing.

properly instructed on the elements of manslaughter, and instructed that, if they had a reasonable doubt that Lewis was guilty of manslaughter, they should find him "not guilty." TEX. PENAL CODE ANN. § 19.04(a) (West 2011). Lewis does not cite us to any authority showing the charge was erroneous, and we do not find it to be so. *See* TEX. CODE CRIM. PROC. ANN. arts. 37.08, 37.09(3) (West 2006) (lesser-included offenses); *see also id.*, art. 36.14 (West 2007) (court must instruct jury on law applicable to the case). Lewis also briefly argues the court should have included criminally negligent homicide as another lesser-included offense instruction in the charge, but does not point us to evidence in the record showing Lewis failed to perceive the risks of his conduct, i.e., that he acted with criminal negligence. *See* TEX. PENAL CODE ANN. §§ 6.03(d), 19.05 (West 2011). Further, Lewis did not request such an instruction and has failed to show it caused him egregious harm. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). We therefore overrule this issue.

### *Motion for New Trial*

Lewis filed a motion for new trial based on "newly discovered evidence" and attached the affidavit of Lewis's other brother, Joshua Lewis. In the affidavit, Joshua states he was present and witnessed the killing of Carl Bennett when he ran into the line of fire coming from Craig Griffin's rifle, and that Shawn Lewis did not shoot Bennett. No hearing was held on the motion and it was overruled by operation of law. Lewis now argues the trial court erred in failing to hold a hearing on the motion to develop the new evidence and should have granted him a new trial based on Joshua's affidavit.

As the State points out, the record does not show that Lewis presented the motion for new trial to the trial court or ever requested a hearing on the motion. TEX. R. APP. P. 21.6; *Rozell v. State*, 176 S.W.3d 228, 230 (Tex. Crim. App. 2005) (in addition to timely filing motion for new trial, defendant must present it to trial court which means giving the court actual notice that he

filed the motion and is requesting a hearing on the motion). If no request for a hearing was presented to the trial court, we do not reach the question of whether the trial court abused its discretion in failing to hold a hearing on the motion for new trial. *Rozell*, 176 S.W.3d at 230.

With respect to whether the court erred in failing to grant a new trial based on Joshua's affidavit, we cannot say the court abused its discretion in light of the testimony in the record that Joshua Lewis lived in the family home along with Shawn and Johnny Lewis, suggesting he was equally known and available to the defense before trial, and the lack of any showing that Joshua's testimony could not have been discovered earlier. *See Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002) (to be entitled to grant of new trial based on newly discovered evidence, appellant must show, among other things, that the evidence was unknown or unavailable to him at the time of trial, and that his failure to discover or obtain the evidence was not due to a lack of diligence). Further, Lewis cites to Rule 21.3(e) as requiring the grant of a new trial under the present circumstances, but has failed to show that Joshua was "kept from the court by force, threats, or fraud" or that his testimony was "intentionally withheld" by the State. *See* TEX. R. APP. P. 21.3(e). Lewis has failed to show the court abused its discretion in failing to hold a hearing on his motion for new trial and in failing to grant a new trial.

## CONCLUSION

Based on the foregoing reasons, we overrule all of Lewis's issues on appeal and affirm the judgment of the trial court.

Rebeca C. Martinez, Justice

DO NOT PUBLISH