Syed Mohmed RABBANI, Appellant,

v.

The STATE of Texas, Appellee.

No. 70455.

Court of Criminal Appeals of Texas,
En Banc.

Sept. 23, 1992.

Rehearing Denied Dec. 9, 1992.

Wayne T. Hill, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and
Linda A. West, Joan Campbell and Lor-
raine Parker, Asst. Dist. Attys., Houston,
Robert Huttash, State's Atty., Austin, for
the State.

## OPINION

MILLER, Judge.

Appellant was convicted of capital mur-
der. V.T.C.A. Penal Code § 19.03(a)(2).
Following the jury's return of affirmative
answers to the two submitted special is-
sues, the trial judge assessed the required
punishment of death by lethal injection.
V.A.C.C.P. Art. 37.071(b)(1) and (2), and
Art. 37.071(e).[1] Appellant raises seventeen
points of error in this direct appeal. We
will affirm the trial court's judgment.[*]

---

1. Since appellant's trial, Art. 37.071 has been
amended by the 72nd Legislature. V.A.C.C.P.
Art. 37.071 (Vernon Supp. 1991).

* Per Tex.R.App.Proc. Rule 90(e), only that por-
tion of this opinion addressing points of error
#16 and #9 are published.

In his sixteenth point of error, appellant contends "the trial court erred in holding the evidence to be sufficient to sustain [his] conviction for the offense of capital murder." The indictment alleged, in pertinent part, that appellant did:

> while in the course of committing and attempting to commit the ROBBERY of MOHAMMED JAKIR HASAN, hereafter styled the Complainant, intentionally cause the death of the Complainant by shooting the Complainant with a gun.

At the close of the State's case-in-chief, appellant's trial counsel moved for an instructed verdict arguing the State failed to prove beyond a reasonable doubt that appellant was in fact present at the scene of the offense, and, either acting alone or with another, committed the alleged robbery-murder. The motion was overruled. On appeal, citing only *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) as authority, appellant contends the trial court erred in its ruling. As this is a challenge to the sufficiency of the evidence to support the jury's verdict, a detailed review of the facts of this offense is required. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990).

The victim, Mohammed Jakir Hasan, worked at a Quick-n-Easy convenience store as a clerk. Testimony revealed the victim was hardworking, frugal, and saving money in an effort to someday own a convenience store. On the evening of October 31, 1987, Hasan planned to work at the Quick-n-Easy till closing and then spend the night at Sajedul Chowdhury's apartment, which Hasan often did because of the apartment's proximity to the convenience store. Chowdhury testified Hasan never came to his home that evening, and after several inquiries as to Hasan's whereabouts, Chowdhury took a taxicab to the convenience store at 7:00 a.m. the following

morning (November 1st). Upon arriving at the store, Chowdhury found Hasan's car in the store parking lot, the store was locked and the lights were on, all of which alarmed him. Chowdhury and the cab driver entered the store[2] and found the safe under the counter was open with only a few coins and Chowdhury's gun, a Colt .38 special revolver, laying inside. The cab driver discovered Hasan's body, in the fetal position, lying in a pool of blood on the bathroom floor in the back of the store. The last entry on the cash register tape was made at 1:03 a.m. on November 1, 1987. The manager of the Quick-n-Easy store testified that approximately $630.00 was missing from the store's safe. The medical examiner testified Hasan died from three close range gunshot wounds, two to the head (which were through and through) and one to the chest.

Hasanur Rahman, who knew both appellant and his cohort in the alleged offense, Shibli Khan, testified that Khan regularly borrowed the keys to his apartment while Rahman was at work in order to watch television and drink beer. Appellant was always with Khan during these visits. Rahman also testified it was not uncommon for Khan to come over to his home in the middle of the night "because [Khan] doesn't sleep much in the night." On November 1st, Rahman was awakened at 2:00 or 2:30 a.m. by Khan's unusually loud knocking on his apartment door and his calling Rahman's name, but Rahman was too tired to answer. Khan left about five minutes later.[3]

Several days later, after learning of the victim's death, Rahman asked appellant and Khan if they knew anything regarding the murder. Rahman testified that appellant appeared nervous and told Rahman "[you] don't want to get involved." Later that same week, Rahman again discussed

---

**2.** Chowdhury testified he was also employed at the Quick-n-Easy, and therefore had keys to the establishment. He also stated the usual procedure was to extinguish the store lights upon closing.

**3.** During this direct examination of Rahman, the prosecutor impeached his testimony with

his prior grand jury testimony in this cause. Rahman admitted he told the grand jury that he heard two voices outside his apartment door on November 1st, those being of appellant and Khan. Rahman further stated that appellant and Khan had previously "knocked and hollered" at his door, called out his name, and that he recognized both their voices.

the murder with appellant and Khan, but this time the two cohorts had imbibed many beers. In response to Rahman's question as to whether appellant was involved in the murder, appellant eventually told Rahman that he and Khan were present at the convenience store and involved in the murder. Appellant explained they decided to kill Hasan when they learned he was saving money to open his own convenience store. He also told Rahman that Hasan "suspected something (sic) going to happen to him[,]" and that he attempted to press the security button near the store counter. Appellant and Khan chased Hasan into the cooler where they shot him, according to Rahman's testimony. On cross-examination, Rahman admitted he testified before the grand jury that appellant told him this murder occurred between 7:30 and 8:00 p.m. Rahman also stated that Khan told him three or four hundred dollars was taken during the robbery.

Out of fear for his own safety, Rahman never called the police. He did, however, transport appellant and Khan to Louisiana on November 9th, and eventually to a Greyhound Bus station where appellant and Khan purchased tickets to New York. Mohamed Abdul Salam testified that he lived in Brooklyn, New York, and on November 23, 1987, he saw appellant and Khan in possession of two pistols, similar to the trial exhibits; however, the last time Salam saw appellant, he did not have a gun but Khan still possessed one. Later that same day, Salam discovered a gun in his previously empty briefcase[4], which he turned over to Frank Ciccone of the New York City Housing Police Department. Ciccone, in turn, sent the briefcase and its contents to the Harris County District Attorney's Office.

Appellant and Khan were next seen in Houston on November 26th when they went to Rahman's apartment. Subsequently, appellant and Khan went to Chowdhury's home where they stayed for a few nights. Chowdhury suspected appellant of committing Hasan's murder, so he telephoned Officer Phillips with the Harris County Sheriff's Department, on December 1st, to inform him appellant was staying in his apartment. Later that day Officer Phillips called Chowdhury at home and told him he was coming over to discuss Hasan's murder. When Chowdhury relayed that information to appellant and Khan, they jumped from the couch, grabbed their clothes, and fled. The police, however, were waiting for them, and immediately arrested appellant and Khan as they attempted to flee in a car with New York license plates.

Phillips questioned appellant upon his arrest about the weapon used to kill Hasan. Appellant admitted he and Khan had two very similar weapons, and so he did not know if the weapon shown to him, which was the gun from New York, was the one used to kill Hasan. Appellant explained that at Khan's instruction he had thrown the second gun into a convenience store dumpster on November 30th. He assisted the police in drawing a map to the convenience store, and the police recovered from the dumpster a .38 caliber Rohm revolver and a pair of gloves.

At the crime scene, on November 1st, police found two apparent bullet holes in the walls of the bathroom where they found the deceased, and also found a small bullet fragment on the floor underneath the bathroom sink. This fragment was placed in an evidence locker at the Harris County Sheriff's Department, but was missing from the locker the following day and was never found. After hollowing out the area behind the sheetrock of the bathroom walls, police failed to recover any bullets. Roughly six weeks later, the police returned to the crime scene, instituted another search of the wall area, and this time recovered a bullet. Officer Bockel testified that at the time he removed the bullet there appeared to be hair and blood on the sheetrock.

---

4. Salam testified he bought a briefcase on November 22, 1987, in which he had not yet put anything. Appellant had asked Salam for the location of the briefcase and the combination to its lock.

A firearms examiner testified that he had done tests with the "dumpster gun" and the morgue bullet,[5] and, in his opinion, the dumpster gun fired the bullet which inflicted the gunshot wound to the victim's chest. He also testified that after examining the wall bullet he concluded that bullet "could have been fired by a Rohm gun" but that it also "could have been fired by several types of guns[.]" He identified the "New York gun" as the same type of gun as the dumpster gun, i.e., a .38 caliber Rohm revolver.

■■■■ In order to sustain a guilty verdict, the State must prove the elements of the offense as set forth in the jury charge. *Rivera v. State*, 808 S.W.2d 80, 91 (Tex. Crim.App.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 279, 116 L.Ed.2d 231, citing *Boozer v. State*, 717 S.W.2d 608, 610–11 (Tex. Crim.App.1984). The charge in this case authorized conviction on two theories of capital murder[6], to-wit:

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 1st day of November, 1987, in Harris County, Texas, the defendant, Syed Mohmed Rabbani, did then and there unlawfully, while in the course of committing the robbery of Mohammed Jakir Hasan, intentionally cause the death of Mohammed Jakir Hasan by shooting Mohammed Jakir Hasan with a gun; or if you find from the evidence beyond a reasonable doubt that on or about the 1st day of November, 1987, in Harris County, Texas, Shibli Khan did then and there unlawfully while in the course of committing the robbery of Mohammed Jakir Hasan, intentionally cause the death of Mohammed Jakir Hasan by shooting Mohammed Jakir Hasan with a gun, and the defendant, Syed Mohmed Rabbani, with the intent to promote or assist the commission of the offense, if

> any, solicited, encouraged, directed, aided or attempted to aid Shibli Khan to commit the offense, if he did, then you will find the defendant guilty of capital murder as charged in the indictment.

After being so charged, the jury returned a general verdict finding appellant guilty of capital murder. The principle is well-established that when the jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld. *Fuller v. State*, 827 S.W.2d 919, 931 (Tex.Crim.App.1992), and cites therein. In reviewing the sufficiency of the evidence, this Court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Rivera*, 808 S.W.2d at 91; and *Fuller*, 827 S.W.2d at 931. We apply that standard of review to each theory of the offense as submitted to the jury through the court's charge.

■■■■ Appellant argues in his brief that the evidence is insufficient because the State failed to prove he fired the fatal shot at the complainant, and because the State was unable to establish that the New York gun had any connection with the victim's murder. Appellant generally argued this contention at trial when he asserted upon his motion for instructed verdict that the State failed to prove the allegations within the indictment. We note that proof beyond a reasonable doubt that appellant actually fired the fatal shot is not necessary for a capital murder conviction where the jury is charged on the law of parties. *See e.g. Belyeu v. State*, 791 S.W.2d 66 (Tex.Crim. App.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 1337, 113 L.Ed.2d 269; and *Crank v. State*, 761 S.W.2d 328 (Tex.Crim.App.1988), *cert. denied,* 493 U.S. 874, 110 S.Ct. 209, 107 L.Ed.2d 162.

---

**5.** The bullet was removed from the victim's body during the autopsy by the medical examiner. This bullet was referred to as the "morgue bullet." The bullet found in the wall of the convenience store was referred to as the "wall bullet."

**6.** The jury was also charged on the lesser included offense of murder under the theories of principal and party.

■ Appellant's admissions to Rahman establish that he and Khan committed the alleged offense together.[7] According to Rahman's testimony, appellant told him he and Khan went to the convenience store, decided to rob Hasan, and then decided to kill Hasan because he could identify them. Rahman's testimony reveals appellant admitted he and Khan chased Hasan to the back of the store where "they" shot him. The State's evidence also established that two guns were used in the commission of this offense, and the firearms examiner expressed his opinion that one of the fatal shots was definitely fired from the dumpster gun. Shortly after the alleged offense, appellant and Khan fled Texas for New York where a gun was later found which was similar to the dumpster gun. Circumstantial evidence inferentially established appellant wielded the New York gun during the commission of this offense. Although the State's evidence does not affirmatively show appellant fired one of the fatal shots, at the very least direct evidence established, beyond a reasonable doubt, his participation in this offense as a party. We hold the evidence is sufficient to support the capital murder conviction, and the trial court did not err in overruling appellant's motion for instructed verdict. Point of error sixteen is overruled.

■ In the ninth point of error, appellant contends inadmissible hearsay testimony was admitted against him during the punishment phase of trial. Moinuddin Saleh testified he was very good friends with Khairul Kabir, who was murdered on or about November 30, 1987. Saleh last saw Kabir on November 29th when Kabir was helping him move into a new apartment. Saleh testified that while he was at Kabir's apartment that afternoon, Khan came by for a visit of "not more than two minutes."

After speaking with Saleh and Kabir, Khan left, and the testimony of which appellant now complains concerns what happened after Khan left. The prosecutor's questioning proceeded as follows:

Q. Did Shibli [Khan] leave the apartment?

A. Yes.

Q. When he left the apartment, did you see Mr. Kabir look anywhere?

A. Yeah, he was looking outside.

Q. While he was looking outside, did Mr. Kabir say anything?

[Defense Counsel]: At this time we would object—excuse me. I will withdraw.

Q. (by the prosecutor) Yes or no, did he say anything?

A. Yes, he did.

Q. What did Kabir say while looking outside the window?

[Defense Counsel]: Object to hearsay.[8]

THE COURT: Overruled.

[Defense Counsel]: Note our exception.

A. (by Saleh) He said Pintu [appellant] is outside.

Q. Did you, yourself, go look out the window to go see Pintu?

A. No, I didn't.

On the afternoon of November 30th, a fellow employee found Kabir lying dead in the bathroom of his apartment. Kabir's hands were handcuffed behind him, and he had been killed by a gunshot wound to his head. The import of Saleh's answer is that appellant was in the vicinity of Kabir's home prior to his murder, intimating he and Khan were involved in this separate offense. Appellant cites only Tex.R.Crim. Evid. 801(d) in support of his contention that Saleh's answer was inadmissible evidence.

The State contended at trial, and does so on appeal, that the statement was admissi-

---

7. Appellant's admissions that he, along with Khan, was involved in Hasan's murder constitute direct evidence of his guilt. *See Rivera*, 808 S.W.2d at 92, citing *Barefoot v. State,* 596 S.W.2d 875, 880 (Tex.Crim.App.1980) (discussing when charge on circumstantial evidence is required).

8. A hearing was held outside the jury's presence before Saleh testified in which appellant more fully presented his objection. The State responded the testimony was admissible as an exception to the hearsay rule, specifically Rule 803(1).

ble as an exception to the hearsay rule, specifically Rule 803(1), which provides:

**Rule 803. Hearsay Exceptions; Availability of Declarant Immaterial**

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

(1) **Present sense impression.** A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

The rationale for the exception stems from the statement's contemporaneity, not its spontaneity, as one commentator has noted:

If a person observes some situation or happening which is not at all startling or shocking in its nature, nor actually producing excitement in the observer, the observer may yet have occasion to comment on what he sees (or learns from other senses) *at the very time that he is receiving the impression.* Such a comment, as to a situation then before the declarant, does not have the safeguard of impulse, emotion, or excitement, but there are other safeguards. In the first place, the report at the moment of the thing then seen, heard, etc., is safe from any error from defect of *memory* of the declarant. Secondly, there is little or no *time* for calculated misstatement, and thirdly, the statement will usually be made to another (the witness who reports it) who would have equal opportunities to observe and hence to check a misstatement. Consequently, it is believed that such comments, strictly limited to reports of *present* sense-impressions, have such exceptional reliability as to warrant their inclusion within the hearsay exception for Spontaneous Declarations.

Ray, 1A Texas Practice, Law of Evidence § 916, at 158–59 (3d ed. 1980) (emphasis in original). *See also Anderson v. State,* 454 S.W.2d 740 (Tex.Crim.App.1970) (statement that "seems like there is a car being stripped down the street there" admissible as res gestae). Applying the rationale for this rule of evidence, we hold Saleh's testimony was admissible as a present sense impression.

According to Saleh, Kabir was looking outside when he stated that appellant was outside. Thus, Kabir's statement explains an event or condition, *viz:* that appellant is outside. Furthermore, Kabir's statement about appellant was made while he was viewing appellant outside, i.e., while the declarant was perceiving the event or condition. Kabir's statement was hence a present sense impression, and Saleh's testimony relating the statement was admissible as an exception to the hearsay rule.[9] The ninth point of error is overruled.

The judgment of the trial court is affirmed.

CLINTON and OVERSTREET, JJ., concur in the result.

BAIRD, J., not participating.

---

**9.** In *Myre v. State,* 545 S.W.2d 820, 827 (Tex. Crim.App.1977), this Court held a statement was not admissible as a present sense impression because the witness did not have an equal opportunity to observe and check a possible misstatement by the declarant. This case preceded by many years the promulgation of the Rules of Criminal Evidence, and Rule 803(1) upon which we rely today contains no requirement that the witness have an opportunity to check the veracity of the declarant's statement. The nature of the present sense impression, contemporaneity of the event and the declaration, ensures reliability of the statement. And, as learned commentators have noted, bolsters the rationale for this hearsay exception. *See* Goode, Wellborn & Sharlot, 33 Texas Practice, Texas Rules of Evidence: Civil and Criminal, § 803.2, p. 577–78 (1988). We, therefore, expressly disavow this language in *Myre.*