**Opinion issued September 22, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00578-CV

————————————

## JIM P. BENGE, M.D. AND KELSEY-SEYBOLD MEDICAL GROUP, PLLC, Appellants

## V.

## LAUREN WILLIAMS, Appellee

On Appeal from the 164th District Court
Harris County, Texas
Trial Court Case No. 2010-52657

## OPINION DISSENTING FROM DENIAL OF EN BANC RECONSIDERATION

I respectfully dissent from the Court's order denying en banc reconsideration

in this case.

For many years now, the civil bench and bar in Texas have been lamenting the "vanishing jury trial." In a recent *Texas Bar Journal* dedicated to addressing this grave concern, Texas State Bar President Trey Apffel explains that "lawyers should be committed to promoting and protecting the rule of law, standing firm for equal access to justice for all people, and educating the public that the right to a trial by jury is the very foundation of our liberties and freedoms."[1] This call to action is very appropriate, especially for members of the judiciary, in the year 2015, as we celebrate the 800th anniversary of Magna Carta, which first provided for public justice in a "certain place,"[2] trial by jury based on the evidence of "credible witnesses to the truth,"[3] equal protection of the law,[4] justices who "know the law of the land and will keep it well,"[5] and the rule of law according to "the lawful judgment of [one's] peers and by the law of the land."[6]

---

[1] Trey Apffel, *President's Opinion: Protecting the Right to Trial by Jury*, 78 TEX. B.J. 194, 194 (2015).

[2] MAGNA CARTA, ch. 17, in A.E. DICK HOWARD, MAGNA CARTA: TEXT & COMMENTARY 41 (1964).

[3] *Id*. ch. 38, at 45.

[4] *Id*. ch. 40, at 45 ("To no one will We sell, to none will We deny or delay, right or justice.").

[5] *Id*. ch. 45, at 47.

[6] *Id*. ch. 39, at 45.

However, in the very same *Texas Bar Journal*, the authors of another article boldly proclaim that the "days of the trial lawyer are essentially gone."[7]  In addressing the fact that civil lawsuit filings are down seventeen percent in Texas in the last ten years, Texas Supreme Court Chief Justice Nathan Hecht notes, "Anytime there's that kind of a shift, then you've got to wonder what is happening. But I think right now, I'm not sure what the answer is."[8]

This case provides some illumination.

## Background

Although this Court has long struggled with the correct disposition of this appeal, the issues in this simple medical-negligence case are not hard.  Seven years ago, in August 2008, appellee, Lauren Williams, who was thirty-nine years old, was admitted to Methodist Willowbrook Hospital ("Methodist") to undergo a laparoscopic assisted vaginal hysterectomy ("LAVH") by the surgeon with whom she contracted, appellant, Jim P. Benge, M.D.  Benge worked for appellant, Kelsey-Seybold Medical Group, PLLC ("Kelsey-Seybold").

Something went terribly wrong during the surgery.  After the LAVH, Williams showed signs of a serious infection and internal bleeding for almost three

---

[7]    Tracy Walters McCormack & Christopher Bodnar, *Honesty is the Best Policy: It's Time to Disclose Lack of Jury Trial Experience*, 78 TEX. B.J. 210, 210 (2015).

[8]    Angela Morris, *Why are Filings Falling? Civil Lawsuits Down 17 Percent in 10 Years*, TEX. LAW., Mar. 9, 2015, *available at* http://www.texaslawyer.com/id=1202719819524/Why-Are-Filings-Falling-Civil-Lawsuits-Down-17-Percent-in-10-Years.

days.  A subsequent surgery revealed that during the LAVH, she had suffered a rectal perforation and urethral injury.  After undergoing a colostomy and urethral repair, doctors admitted Williams to the Intensive Care Unit ("ICU") in septic shock.  They placed her in a medically induced coma for three weeks, and she required a mechanical ventilator to breath.  Doctors also had to perform a tracheotomy on Williams because of her compromised pulmonary system.  And she received antibiotic therapy and intravenous nutrition.  In October 2008, Williams was released to a long-term acute care facility, where she spent a month recovering.  She had to endure several subsequent surgeries, and she continues to suffer from the wounds inflicted upon her and complications resulting from her permanent colostomy.

What went wrong during the LAVH?

At trial, Williams presented evidence that, unbeknownst to her, Dr. Benge had a Methodist resident, Dr. Lauren Giacobbe, perform forty to fifty percent of the surgery, even though Giacobbe had no previous experience performing the procedure.  Williams also presented the shocking evidence that Benge did not tell her prior to the LAVH that a resident would be performing forty to fifty percent of her surgery, and he did not tell Giacobbe prior to the LAVH that she would be performing any part of Williams's surgery.  This is especially surprising considering that Benge knew that Giacobbe had not previously performed an

4

LAVH. Williams's evidence further reveals that during her long and painful recovery after the LAVH, Benge never informed her or her family of Giacobbe's part in the surgery. Indeed, according to Williams, she did not learn of Giacobbe's role in the LAVH until after she had filed this lawsuit.

Thus, in addition to presenting evidence of Dr. Benge's negligence, as a surgeon and supervisor of Dr. Giacobbe, Williams also presented compelling evidence that Benge did not properly prepare Giacobbe for her role during the LAVH and evidence calling into question Benge's credibility—evidence which is completely at odds with Benge's testimony that Williams "gave [him] consent to have Dr. Giacobbe participate in the surgery."

And because evidence was introduced that Dr. Benge believed that the injuries inflicted upon Williams during the surgery were caused by "an electrical arc from [a] Bovie," an electrical cauterizing instrument, and not his own negligence as a surgeon and supervisor, Benge's credibility was an issue that was front and center throughout the trial. Flatly rejecting Benge's testimony regarding causation, Dr. Bruce Patsner, Williams's medical expert, testified that the perforation of Williams's intestine was inflicted as the result of a surgical cut made during the vaginal portion of the procedure. Patsner opined that, based on reasonable medical probability, the perforation was caused by Dr. Giacobbe, who had no experience performing the procedure. Patsner further opined that Benge,

5

while Williams suffered immediately after the LAVH, should have suspected a bowel injury and failed to timely and properly address Williams's post-operative complications, resulting in a "septic shock catastrophe."

In her Second Amended Petition, Williams sued Dr. Benge and Kelsey-Seybold only for negligence. And the only theory of liability that the trial court submitted to the jury was for negligence. In its charge, after supplying the jury with the standard definitions on "Ordinary Care," "Negligence," and "Proximate Cause," the trial court asked:

> Did the negligence, if any, of any of those named below proximately cause Lauren Williams' injuries in question?
>
> Answer "Yes" or "No" for each of the following:
>
> Jim Benge, M.D.             _____
>
> Carmen Thorton, M.D.       _____
>
> Lauren Williams             _____

The jury answered "No" as to Dr. Thorton and Williams and "Yes" as to Benge.

## Instruction Error and Harm

Let there be no mistake: Williams did not plead, present any evidence, or ask the jury to find that Dr. Benge was in any way negligent in failing to inform her of "the risks and hazards involved" in the LAVH. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (Vernon 2011). And the trial court did not submit any such issue to the jury to co-mingle with Williams's simple medical-negligence claim.

6

In a suit against a physician involving a health care liability claim that is "based on the failure of the physician . . . to disclose or adequately disclose the risks and hazards involved in [a] . . . surgical procedure rendered by the physician," "the *only theory* on which recovery may be obtained is that of *negligence in failing to disclose the risks or hazards* that could have influenced a reasonable person in making a decision to give or withhold consent." *Id*. (emphasis added). Thus, in regard to section 74.101, Dr. Benge only had a duty to inform Williams of "the risk and hazards involved" in the procedure as determined by the Texas Medical Disclosure Panel. *Id*. §§ 74.101–.103 (Vernon 2011). Not only did Williams not allege or present any evidence that Benge had violated this duty, she also did not dispute his evidence that he in fact did inform her of "the risks and hazards involved" in the LAVH, as required by section 74.101. Thus, section 74.101 simply does not apply in the instant case.[9]

---

[9]    As expressly explained by then Justice Hecht, when a health care liability claim is "not based on a failure to disclose the risks of [a] 'medical care or surgical procedure,'" section 74.101 does not apply. *Felton v. Lovett*, 388 S.W.3d 656, 660 (Tex. 2012). And, "when [s]ection 74.101 does not apply, the common law does." *Id*. Moreover, "[s]ection 74.101 *does not purport to affect the common law in cases other than those the statute covers*, and nothing in the [statute] suggests a different intent." *Id*. at n.10 (emphasis added) ("Whether a statute modifies or abrogates the common law depends on legislative intent." (citing *Energy Serv. Co. of Bowie, Inc. v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex. 2007))).

Contrary to this reasoning, the panel majority claims that section 74.101 is part of "a comprehensive statutory scheme concerning disclosure and informed consent law." And the panel majority goes further astray, holding that "Texas law does not impose a legal duty to disclose to a patient specific information about a

7

Regardless, the panel majority concludes that the trial court's "single question [to the jury] . . . '*effectively submitted*' two different negligence questions." (Emphasis added.) In support of this conclusion, the panel majority creates a straw man, asserting:

> Under her unpleaded informed consent theory, Dr. Benge knew an inexperienced resident was going to perform a substantial portion of the surgery under his supervision *and he negligently failed* to provide that information to Williams before the operation.[10]

(Emphasis added.) It further asserts that Williams's evidence and what it characterizes as her "trial theme" "created the possibility of a liability finding

consented-to assisting surgeon's anticipated level of participation or experience." In support of this seminal and extraordinary holding, the panel majority relies on "the analysis" in *Haynes v. Beceiro*, 219 S.W.3d 24 (Tex. App.—San Antonio 2006, pet. denied).

Not only is the panel majority's interpretation of section 74.101 inconsistent with that of the Texas Supreme Court's interpretation, as expressly stated in *Felton*, but the analysis of the court in *Haynes* is simply not applicable in the instant case. In *Haynes*, the court held that the "battery claim" of Haynes, the plaintiff-patient, against Dr. Beceiro, an assisting surgeon, was precluded because Haynes had actually consented to Beceiro performing surgery on her. 219 S.W.3d at 26–27.

Here, in contrast, Williams has not sought to hold Dr. Giacobbe liable for "battery" or under any other liability theory. And she at no time has ever sought to hold Dr. Benge liable for any "battery" committed against her by Giacobbe. Indeed, the panel majority's reliance on *Haynes* reveals its fundamental mischaracterization of Williams's actual liability claims, which concern only Benge's negligence as a surgeon and supervisor of Giacobbe.

Thus, the premises upon which the panel majority relies do not support its extraordinary holding. And, as demonstrated below, the ultimate issue answered by the panel majority is not even properly before this Court.

10 Contrary to the panel majority's assertion, both parties stated at trial that this is "not an informed-consent case." As Williams's counsel explained to the trial court, "It's a negligence case."

8

based on either of the two negligence theories: negligence during and after the surgery and *negligence before the surgery in failing to disclose Dr. Giacobbe's participation or level of experience*." (Emphasis added.)

Again, let there be no mistake: Williams did not assert that Dr. Benge had "negligently failed" to inform her that Dr. Giacobbe "was going to perform a substantial portion of the surgery." She expressly, and in no uncertain terms, stated that his testimony that she had actually "g[iven him] consent to have Dr. Giacobbe participate in the surgery" was false. If Williams's presentation of the case had an underlying "theme," it was that Benge, prior to the LAVH, *intentionally* deceived her into believing that he would be her surgeon, and, after the LAVH, *intentionally* withheld information from her and her family regarding Giacobbe's role in causing her injuries.

Although the parties and this Court have used the words "informed consent" and "disclosure" in a somewhat confusing manner, the record, when read in context, reveals that Williams's use of these terms in the trial court directly related to Dr. Benge's credibility, his breaking of his "bond" with her to perform the surgery himself, his lack of respect for her as a patient, and his complete lack of candor after the botched LAVH. For example, in her opening statement, Williams, without objection, asserted:

> *It is not Dr. Benge's choice to treat this patient as a human guinea pig.* He doesn't have that choice. It's the patient's choice.

9

He made the choice for her, and he didn't tell her that Resident Lauren Giacobbe was going to do the procedure. He didn't tell her that the resident had never done the procedure before. *To this day, he didn't tell her that.*

You see, after it was over, when the family was there at her bedside, he came and talked to them; *he didn't tell them the full story. He didn't tell her, the family first, that a resident did a significant amount of this procedure. When she woke up, he didn't tell her that a resident did a significant amount of this procedure.*

(Emphasis added.) In her closing argument, Williams, again without objection, emphasized:

[W]ho did Lauren Williams hire to be her surgeon? Kelsey-Seybold, Dr. Jim Benge. He -- she hired his hands, his experience; but under anesthesia, she got another set of hands working on her, some -- a set of hands she did not know, who had never done the job before, had no experience. You can't do this in our community. *And we didn't even find out about any of this until after this lawsuit was filed.*

. . . .

Doctors who don't use ordinary care have to be held accountable, and they agree with that. *As caretakers of our community, you also enforce the values that we have, and I believe in this city, in this state, your word is your bond.*

*Dr. Benge's word that he was going to perform the surgery is his bond.* They may say "I want you to just look at the word 'resident' in that disclosure." I do want you to look at it, not just the word "resident," the whole sentence.

Was a resident necessary to do this procedure? No, because a nurse could've assisted in this procedure. Was the resident required? No, because Dr. Benge testified "I could do a hundred percent of this procedure."

10

So read the words, all of the words, not just the pieces that they want you to look at.

A contract -- she hired Dr. Benge to do the surgery. He agreed to do the surgery. He didn't do all of the surgery. No matter how you parse it . . . .

. . . .

As caretaker of our community, *hold them to their word*. Make them do what they promise to do from here on out. "If you promise to do the surgery and you're in a private hospital, do the surgery." The fact that people at Ben Taub get more information than you do should be appalling to each and every one of you. When your family members, when you, your friends go into the hospital, you will now know "I need to ask some questions."

(Emphasis added.)

Moreover, Williams, in her closing, again without objection, made specific reference to the fact, which she established through her medical expert, that the American Medical Association ("AMA") Code of Medical Ethics Opinion 8.16 states that "[a] surgeon who allows a substitute to operate on his or her patient without the patient's knowledge and consent is *deceitful*."[11] Williams argued:

---

[11] AM. MED. ASS'N, COUNCIL ON ETHICAL AND JUDICIAL AFFAIRS, CODE OF MEDICAL ETHICS, CURRENT OPINIONS: OPINION 8.16 – SUBSTITUTION OF SURGEON WITHOUT PATIENT'S KNOWLEDGE OR CONSENT (1994), *available at* http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medic ical-ethics/opinion816.page (emphasis added). Opinion 8.16 – Substitution of Surgeon without Patient's Knowledge or Consent, provides:

> A surgeon who allows a substitute to operate on his or her patient without the patient's knowledge and consent is *deceitful*. The patient is entitled to choose his or her own physician and should be permitted to acquiesce to or refuse the substitution. The surgeon's

11

Then we talk about what the national standards are. *I didn't say he was deceitful. That's what the AMA says.* The AMA says a surgeon who allows a substitute to operate on his or her patient without the patient's consent is *deceitful*.

That's not me arguing. That's the AMA. These people are members of the AMA. That's their guidelines. That's what the AMA says.

---

obligation to the patient requires the surgeon to perform the surgical operation: (1) within the scope of authority granted by the consent to the operation; (2) in accordance with the terms of the contractual relationship; (3) with complete disclosure of facts relevant to the need and the performance of the operation; and (4) utilizing best skill.

It should be noted that it is the operating surgeon to whom the patient grants consent to perform the operation. *The patient is entitled to the services of the particular surgeon with whom he or she contracts. The operating surgeon, in accepting the patient, is obligated to utilize his or her personal talents in the performance of the operation to the extent required by the agreement creating the physician-patient relationship.* The surgeon cannot properly delegate to another the duties which he or she is required to perform personally.

Under the normal and customary arrangement with patients, and with reference to the usual form of consent to operation, the operating surgeon is obligated to perform the operation but may be assisted by residents or other surgeons. *With the consent of the patient*, it is not unethical for the operating surgeon to delegate the performance of certain aspects of the operation to the assistant provided this is done under the surgeon's participatory supervision, ie, the surgeon must scrub. If a resident or other physician is to perform the operation under non-participatory supervision, it is necessary to make a full disclosure of this fact to the patient, and this should be evidenced by an appropriate statement contained in the consent. Under these circumstances, it is the resident or other physician who becomes the operating surgeon. (I, II, IV, V).

*Id.* (emphasis added).

(Emphasis added.) If the jury believed Williams's evidence that Dr. Benge did not tell her about Dr. Giacobbe's role in the LAVH, then it, considering the AMA's Code of Medical Ethics, could have reasonably believed that, in his dealings with Williams, he acted unethically and deceptively.[12]

Just because Williams referred to the facts that she had a contract with Dr. Benge to perform the LAVH and he had broken his "bond" with her, does not mean that she was asking the jury to find him liable for breach of contract. Likewise, just because Williams referred to the facts that Benge did not tell her that he was going to have a resident perform forty to fifty percent of the surgery and, thus, acted "deceitful[ly]" and unethically as per the AMA, does not mean that she was, as claimed by the panel majority, asking the jury to find that "*he negligently failed* to provide that information to Williams before the operation." (Emphasis added.) Simply put, the fact that Williams presented evidence and argued that

---

[12] *See* TEX. PENAL CODE ANN. § 31.01(1) (Vernon Supp. 2014) (providing multiple definitions of "deception," including "promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed" and "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true"); *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App.— Houston [14th Dist.] 2010, no pet.) (listing, as an element of "fraud by nondisclosure," "the defendant failed to disclose facts to the plaintiff"); *see also* BLACK'S LAW DICTIONARY 492 (10th ed. 2009) (defining "deception" as "[t]he act of deliberately causing someone to believe that something is true when the actor knows it to be false"); *id.* at 491 (defining "deceit" as "[t]he act of intentionally leading someone to believe something that is not true").

13

Benge violated the standards of the AMA's Code of Medical Ethics did not transform her medical-negligence case into an "informed-consent" case.

Nevertheless, the panel majority, based entirely upon its own characterization of Williams's case, and not the case that she actually tried, proceeds to knock down its straw man, holding that the trial court's "broad form negligence question effectively included an informed consent issue and therefore violated" *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000). In support of this holding, the panel majority relies on *Casteel*, *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851 (Tex. 2009), and *Texas Commission on Human Rights v. Morrison*, 381 S.W.3d 533 (Tex. 2012). However, neither *Casteel* nor *Hawley* nor *Morrison* supports the panel majority's holding.

In *Casteel*, the Texas Supreme Court held,

> [W]hen *a trial court submits* a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory. *See* TEX. R. APP. P. 61.1 ("No judgment may be reversed on appeal . . . unless the Supreme Court concludes that the error complained of . . . probably prevented the petitioner from properly presenting the case to the appellate courts."); *see also* TEX. R. APP. P. 44.1(a).[13]

---

[13]     In stark contrast to the Texas Supreme Court's holding in *Casteel*, the Texas Court of Criminal Appeals, in affirming judgments imposing the death penalty in two separate capital-murder cases, held that where a "trial court's charge authorize[s] [a] jury to convict on alternative theories, the verdict of guilt will be upheld if the evidence [is] sufficient *on any one of the theories*." *Sorto v. State*, 173 S.W.3d

22 S.W.3d at 388 (emphasis added). In reaching its holding, the court noted that the trial court's jury charge contained "a single broad-form liability question" containing instructions "on thirteen independent grounds for liability," four of which were invalid because they "required . . . consumer status," which the plaintiff did not have. *Id.* at 387–88.

In *Hawley*, the supreme court, in an issue that it labeled as "Failure to Give the Instruction," held that the trial court erred in not instructing the jury, as requested by the defendant-hospital, that it could not consider the acts or omissions of a defendant-doctor, who was not an agent of the hospital, when determining the hospital's negligence. 284 S.W.3d at 862–65. The trial court's liability question asked, "Was the negligence, if any, of [the defendant-hospital], a proximate cause of injuries to [the plaintiff]?" *Id.* at 863. The court noted that the trial court had instructed the jury that the defendant-hospital "acts or fails to act only through its employees, agents, nurses, and servants" and certain evidence showed that the defendant-doctor worked in an office in the hospital and had "input" in the hospital's policy that its pathologists were to verbally notify doctors when a patient, like the plaintiff, was diagnosed with cancer. *Id.* The court explained that because the trial court had not defined the word "agent," the jury could have

---

469, 472 (Tex. Crim. App. 2005) (emphasis added) (citing *Rabbani v. State*, 847 S.W.2d 555, 558–59 (Tex. Crim. App. 1992)).

15

erroneously considered the defendant-doctor to be an agent of the defendant-hospital. *Id.*

After concluding that the trial court had erred in denying the defendant-hospital's requested instruction, the supreme court, under the sub-heading of "Harm," concluded that the harm analysis of rule 61.1(b) "applies . . . because the jury could have found [the defendant-hospital] liable based on [the defendant-doctor's] acts or omissions under the charge as given, and there is no way for [the defendant-hospital] or an appellate court to tell if it did so." *Id.* at 865.

In the instant case, the panel majority cites *Hawley* for the following proposition:

> If one of the plaintiff's legal theories does not support liability as a matter of law and *the plaintiff presented evidence to the jury on that theory* that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, *there is a Casteel-type charge error. See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863–65 (Tex. 2009) (broad-form negligence question included instruction that hospital acts through its employees, agents, nurses, and servants but did not inform jury that hospital is not legally liable for acts of independent contractor-physician and, as result, appellate court could not tell if jury impermissibly found hospital liable for acts of doctor where evidence raised that possibility).

(Emphasis added.) The panel majority's characterization, in its published opinion on the merits, of *Hawley* is flat wrong.

In fact, the supreme court in *Hawley* expressly agreed with the plaintiff that "the harm question presented in *Casteel* is *different* from that presented here

16

*because here the charge did not submit an invalid theory to the jury*." 284 S.W.3d at 865 (emphasis added). It noted that submission of an invalid theory involves a trial court's error in instructing a jury to consider erroneous matters and the defendant-hospital "d[id] not contend that the jury was allowed to consider an improper theory of liability by the charge that allowed the hospital to be held liable for actions of its agents." *Id*. The court explained, thus,

> [T]he presumed harm analysis of Rule 61.1(b) was applied in *Casteel* and *Harris County* to a different jury charge problem than is presented here. *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) ("We specifically limited our holdings in *Casteel* and *Harris County* to submission of a broad-form question incorporating multiple theories of liability or multiple damage elements.").

*Id*. Even though the court considered *Casteel* inapplicable, it did apply the harm analysis of rule 61.1(b) in *Hawley* "because the jury could have found [the defendant-hospital] liable based on [the defendant-doctor's] acts or omissions under the charge as given, and there is no way for [the defendant-hospital] or an appellate court to tell if it did so." *Id*. In doing so, the court made sure to note that "in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment."[14] *Id*.; *see also* TEX. R. APP. P. 61.1(a).

---

[14] In its "Supplemental Opinion," the panel majority appears to recognize that the supreme court in *Hawley* actually addressed "jury-instruction error." However, the panel majority, unlike the supreme court in *Hawley*, does not address the issue of whether the trial court actually erred in denying Dr. Benge's requested

In *Morrison*, the supreme court, following its precedent in *Casteel*, held that because the broad-form liability question submitted to the jury by the trial court "allowed liability for '*adverse personnel actions*,' the jury could have improperly found liability based upon [a] denied promotion," which constituted an invalid theory of liability. 381 S.W.3d at 537 (emphasis added). Prior to filing her suit against the defendant-employer for retaliation, the plaintiff-employee, in *Morrison*, filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which is a prerequisite to suit against a government entity like the defendant-employer. *Id*. at 535–37 (citing TEX. GOV'T CODE ANN. § 311.034 (Vernon 2013)). The plaintiff's EEOC complaint "included several bases for discrimination," but not the denied promotion. *Id*. at 535.

The trial court did not define "adverse personnel actions" in the jury charge, and the defendant specifically objected, arguing that the trial court's use of the term "adverse personnel actions" would "allow the jury to find liability without unanimity because there were multiple occurrences the jury could view as adverse

instruction. Instead, it continues to presume error, and that it was preserved, and then it presumes harm. And the panel majority's published opinion, which mischaracterizes *Hawley* as a case involving "*Casteel*-type charge error" and a "broad-form negligence question," has not been withdrawn and still stands. *See* TEX. R. APP. P. 47.7 cmt. ("All opinions and memorandum opinions in civil cases issued after the 2003 amendment have precedential value."); *see also First Gibraltar Bank, FSB v. Christian*, No. 14-94-01212-CV, 1995 WL 645120, at *1 (Tex. App.—Houston [14th Dist.] Nov. 2, 1995, writ denied) (not designated for publication) ("[P]ublished opinions setting forth the analysis and decisions of federal and state courts . . . constitute legal authority or precedent.").

18

personnel actions." *Id*. The defendant then "tendered a liability question that focused solely on the termination," but the trial court denied the request. *Id*. In reaching its holding, the supreme court explained that because the trial court submitted the liability question in a way that "prevent[ed] [the] parties [and] the Court from knowing for certain what theory the jurors relied upon," the defendant was "prohibited from demonstrating on appeal that the jury's verdict was based upon the invalid legal theory." *Id*. at 537. In other words, the supreme court "presumed" harm as it did in *Casteel*. *Id*. at 534, 536, 538.

Here, unlike in *Casteel* and *Morrison*, the trial court simply did not in its charge to the jury submit a single broad-form liability question that erroneously commingled valid and invalid theories of liability. As previously explained by the supreme court, submission of an invalid theory of liability necessarily involves a trial court's error in affirmatively instructing a jury to consider erroneous matters. *Hawley*, 284 S.W.3d at 865. And the supreme court has "specifically limited [its] holdings in *Casteel* and *Harris County* to *submission* of a broad-form question incorporating multiple theories of liability or multiple damage elements." *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756 (Tex. 2006) (emphasis added).

As in *Hawley*, the trial court here did in fact deny Dr. Benge's request for an instruction.[15] He requested that the trial court instruct the jury:

> You are instructed that in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery.

Thus, under the supreme court's holding and reasoning in *Hawley*, the panel majority was required, before presuming harm under rule 66.1(b), to determine first whether the trial court had erred in denying Benge his requested instruction. And if, and only if, the trial court erred in denying this instruction, then, and only then, should the panel have considered whether, from the trial court's error, harm should be presumed under rule 66.1(b). *Hawley*, 284 S.W.3d at 865.

First, it should be noted that Dr. Benge, prior to asking for the above instruction for the first time in the charge conference, had already waived any error in regard to Williams's statements, evidence, and arguments about "informed consent" or "disclosure." Although the trial court had initially granted Benge's

---

[15] In its "Supplemental Opinion," the panel majority, continuing in its erroneous reliance on *Casteel*, asserts that the error in this case "was not simply the denial of Dr. Benge's proposed instruction," but rather "also the submission . . . of a single broad-form jury question that mixed a valid and invalid theory." However, the panel majority never actually addresses, in either its published opinion or "Supplemental Opinion," whether the trial court erroneously denied Benge's proposed instruction or whether he preserved such error for our review. Notably, Benge, in his appellant's brief, expressly states that "[t]he trial court erred when it refused [his] request for an instruction in the charge clarifying that the jury could not find [him] liable on th[e] informed-consent ground."

20

motion in limine on the topic, and even sustained one of his objections, the record reveals that Benge repeatedly failed to object when he was required to do so. In fact, the record reveals that he made only two objections during the presentation of the evidence and none during Williams's opening statement and closing argument. And he, himself, extensively testified that he had warned Williams of the risks and hazards involved in the LAVH and Williams had "g[iven him] consent to have Dr. Giacobbe participate in the surgery."[16] At one point, while Williams had her medical expert on direct examination and Benge objected to a question about her lack of consent, the following exchange occurred:

| [Williams]: | One other thing, Judge. They spent a fair amount of time going through the informed consent page with Dr. Benge, and he -- they asked him a question, "Did you get proper informed consent?" "Yes, I did." They've waived that already. |
| [Dr. Benge]: | Don't believe we have waived it because we had a running objection at the beginning of the case. |
| [Williams]: | Can't have a running objection to your own questions. |
| [Dr. Benge]: | Yeah. |

---

[16] Dr. Benge, at the beginning of trial, requested "a running objection to the questions about informed consent," which the trial court granted, although it cautioned, "I will tell you I'm not sure if it holds water when we get to the appellate level." Benge's "running objection" became null, however, when he, himself, testified about "informed consent." *See Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007) (error in admission of evidence waived if objecting party permits same or similar evidence to be introduced without objection).

Second, even if Dr. Benge had not waived the issue, the trial court did not err in denying the instruction that he requested. Again, he requested that the trial court instruct the jury that "in deciding whether any defendant was negligent, you cannot consider what the defendant told, or did not tell, the plaintiff about the resident physician being involved with the surgery." He did not request that the trial court instruct the jury to consider such evidence only in determining his credibility and for no other purpose; thus, his proposed instruction was overbroad. Because the complained-of evidence directly concerned the issue of Benge's credibility and the evidence showed that he believed that an "electrical arc from [a] Bovie" had caused Williams's injuries, the jury was entitled to consider any evidence of his "deceitful[ness]" in deciding whether to reject his explanation of causation. And, again, Williams certainly had the right to refute Benge's testimony that she had in fact "g[iven him] consent to have Dr. Giacobbe participate in the surgery," which also served to impeach his credibility. Thus, Benge's requested instruction, as written, would have misled the jury into thinking that it could not consider the complained-of evidence to assess his credibility for determining the ultimate issue in the case.

Third, even if the trial court had erred in denying Dr. Benge his requested instruction, this is not a case where harm should be presumed under rule 66.1(b), as it was in *Hawley*. Again, as explained by the Texas Supreme Court, "in most cases

22

where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment." *Hawley*, 284 S.W.3d at 865; *see also* TEX. R. APP. P. 61.1(a). Rule 61.1(b) does not apply here because the jury could not, as asserted by the panel majority in its characterization of Williams's case, have found Benge liable based on a theory that he "*negligently failed* to provide that information to Williams before the operation." (Emphasis added.)

Again, Williams simply did not assert that Dr. Benge had "negligently failed" to inform her that Dr. Giacobbe "was going to perform a substantial portion of the surgery." Rather, she pulled no punches and directly accused Benge of being intentionally "deceitful" and unethical, citing his violation of the AMA's Code of Medical Ethics. And she expressly, and in no uncertain terms, stated that his testimony that she had actually "g[iven him] consent to have Dr. Giacobbe participate in the surgery" was false. Thus, to the extent that the panel majority, in characterizing the "theme" of Williams's case, relies on Dr. Patsner's testimony that Dr. Benge's "betrayal" in not "explain[ing] who was doing the surgery on Ms. Williams" was "outside the standard," it errs.

Finally, it should be noted that because Dr. Benge has conflated *Casteel*-type submission error, where harm is presumed, with error regarding the denial of a requested instruction, where error is most often not presumed, Benge, in his

23

appellant's brief, did not present this Court with a harm analysis as required. *See* TEX. R. APP. P. 38.1(i).

In sum, the panel majority, in characterizing Williams's case for her, sets up the straw man that she "effectively" presented to the jury an "unpleaded informed consent theory" and asked it to find that Dr. Benge "negligently failed" to inform her that he intended to use "an inexperienced resident" "to perform a substantial portion of the surgery." It then knocks down the straw man, holding that the trial court's "broad form negligence question effectively included an informed consent issue and therefore violated *Casteel*." In reaching this holding, the panel majority not only misinterprets *Casteel* and *Morrison*, but conflates "*Casteel*-type charge error," i.e., error involving a trial court's submission of multiple theories of liability, with error involving the denial of a requested instruction.

More important, in doing so, the panel majority, in its published opinion on the merits, disregards the Texas Supreme Court's actual holding in *Hawley*, mischaracterizes the court's opinion as relying upon *Casteel* in presuming harm, despite the fact that it expressly states that *Casteel* is "different," and then cites *Hawley* in support of its holding. *See Hawley*, 284 S.W.3d at 865. In doing so, the panel extends the holding of *Casteel* regarding presumption of harm in cases involving the erroneous submission of multiple liability theories to cases involving the denial of a requested instruction. And the panel majority does this in spite of

24

the fact that the supreme court in *Hawley* expressly stated, "in most cases where a trial court errs by refusing to give a proposed instruction the harm analysis will be based on whether the refusal probably caused the rendition of an improper judgment."[17] *Id.*; *see also* TEX. R. APP. P. 61.1(a).

Here, the panel majority reverses the trial court's lawful judgment entered in favor of Williams, not on a legitimate legal point of error, but upon a wholly manufactured appellate issue. In doing so, the panel majority not only wrongfully deprives Williams of her lawfully rendered verdict and judgment, it also unnecessarily places upon her the burden of yet more expense and delay in securing justice. And because the panel majority misapplies the holdings and reasoning of the Texas Supreme Court in *Casteel*, *Hawley*, and *Morrison*, the panel majority's error is of such magnitude that it should be corrected by this court sitting en banc or by our high court. *See* TEX. R. APP. P. 41.2(c) ("[E]xtraordinary circumstances require en banc consideration."); TEX. GOV'T CODE ANN.

---

[17] After again presuming harm, after first presuming error, in its "Supplemental Opinion," the panel majority asserts that "[t]here were easy solutions" to correct the trial court's error, such as "narrowing the [jury] question to inquire about negligence during or after the surgery or an instruction that a failure to disclose could not form the basis for a finding of negligence." However, Dr. Benge did not ask for either of these remedies, instead he merely requested an overly broad jury instruction, which the trial court would have erred in submitting. *See Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 670 (Tex. App.—Texarkana 1991, writ denied) (concluding instruction "overly broad" where it would have prevented jury from considering evidence for valid purposes).

§ 22.001(a)(6) (Vernon 2004) ("The supreme court has jurisdiction [when] . . . it appears that an error of law has been committed by the court of appeals.").

## Conclusion

This case serves as a cautionary tale and illustrates the dangers encountered when courts engage in deciding cases ad hoc and not in accord with established precedent. Such decision making, not only unnecessarily adds time and expense to the disposition of a case, doing a disservice to the litigants, but also undermines the rule of law. If the rule of law means anything, it means that judges are bound to follow well-established and sound legal precedent. Although we, as intermediate appellate court justices, are certainly free to point out any flaws in the reasoning of the opinions of our high courts, we are not free to disregard binding precedent.

Why in Texas are the rights to public justice and civil trial by jury vanishing? Some might reasonably argue that these rights are, to a large extent, vanishing because of the acts and omissions of our courts—the very same entities that were created to serve and maintain them. The problem is not new. In making the case for reform of the Court of Chancery in nineteenth century England, Charles Dickens, in *Bleak House*, wrote:

> This is the Court of Chanery; . . . which so exhausts finances, patience, courage, hope; so overthrows the brain and breaks the heart; that there is not an honorable man among its practioners who would

26

not give—who does not often give—the warning, "Suffer any wrong that can be done to you, rather than come here!"[18]

As illustrated by Dickens's tale, if we, as lawyers and judges in the year 2015, want to preserve and protect the 800-year-old legacy of Magna Carta, we must be ever vigilant in the performance of our duties as stewards and "guardians of the law."[19] If we fail in fulfilling these critical duties, not only will we ultimately render ourselves irrelevant, but the rule of law, guaranteed by Magna Carta, will become a mere memory. Thus, our profession should address Chief Justice Hecht's concern about the vanishing jury trial and answer State Bar President Apffel's call to action to "stand[] firm for equal access to justice" and educate the public that "the right to trial by jury is the very foundation of our liberties and freedoms."[20] We should, in the words of President Lincoln, re-

---

[18] CHARLES DICKENS, BLEAK HOUSE 13 (Stephen Gill ed., Oxford Univ. Press 2008) (1853).

[19] *See* TEX. DISCIPLINARY RULES PROF'L CONDUCT preamble ¶ 1, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (Vernon 2013). For example, in order for our adversarial system to function properly, lawyers, in zealously representing their clients, must always be mindful of their duties to disclose to courts controlling authority "adverse to the position" of their client, not "make a false statement of material fact or law to a [court]," and not "take a position that unreasonably increases the costs or other burdens of the case or that unreasonably delays resolution of [a] matter." *Id.* at R. 3.02, 3.03(a)(1), (a)(4). And judges, as neutral referees, must always "comply with the law" and "accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law." TEX. CODE JUD. CONDUCT, Canons 2(A), 3(B)(8), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B (Vernon 2013).

[20] Apffel, *supra* note 1, at 194; Morris, *supra* note 8.

dedicate and "take increased devotion to"[21] our solemn duties to protect the rule of law.

And if we, on the bench and in the bar, really want to provide real access to civil justice for all, preserve the civil right to trial by jury, and maintain the rule of law, we should, first and foremost, not deprive a party of justice by taking from her a lawfully-obtained judgment. Like good doctors, we should first do no harm.

Terry Jennings
Justice

Panel Consists of Justices Keyes, Bland, and Brown.

Justice Keyes, dissenting.

En banc reconsideration was requested. *See* TEX. R. APP. P. 49.7.

A majority of the justices of the Court voted to deny the motion for en banc reconsideration.

The en banc court consists of Chief Justice Radack and Justices Jennings, Keyes, Higley, Bland, Massengale, Brown, Huddle, and Lloyd.

Justice Brown, writing a supplemental opinion on motion for en banc reconsideration, joined by Justice Bland.

---

[21] Abraham Lincoln, Address at the Dedication of the Cemetery at Gettysburg, Pennsylvania (November 19, 1863), *reprinted in* ABRAHAM LINCOLN: THE GETTYSBURG ADDRESS AND OTHER SPEECHES 82 (1995).

Justice Jennings, dissenting from the denial of en banc reconsideration with separate opinion, joined by Justices Keyes and Higley.

Justice Keyes, dissenting from the denial of en banc reconsideration with separate opinion.

Justice Lloyd, dissenting from the denial of en banc reconsideration with separate opinion, joined by Justices Keyes and Higley.